**UNITED STATES of America**
**v.**
**Gerald A. WILSON, Appellant.**
**No. 71-1067.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 19, 1972.

Decided Oct. 20, 1972.
Certiorari Denied Feb. 26, 1973.
See 93 S.Ct. 1431.

Mr. Lawrence A. Hymo, Washington, D. C. (appointed by this Court), for appellant.

Mr. Robert S. Tignor, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and Stephen W. Grafman, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, SIMON E. SOBELOFF,* Senior Circuit Judge for the Fourth Circuit, and McGOWAN, Circuit Judge.

BAZELON, Chief Judge:

Appellant was convicted of armed robbery, assault with a dangerous weapon, and carrying a dangerous weapon [1] in connection with the hold-up of a filling station. On this appeal he challenges the finding of the trial court, sitting without a jury, that the defendant was criminally responsible for his act. He also argues that the sentence of imprisonment imposed by the district court was cruel and unusual punishment in view of the district court's finding that the defendant is mentally ill. For the reasons set forth below we affirm.

I.

At a jury trial, the government introduced evidence that appellant entered a gasoline filling station at about 7:15 p. m., pointed a gun at two attendants, demanded money from both of them, and fled from the station on foot with more than $500 in cash. Arrested within minutes, appellant was transported back to the scene of the crime where he was identified by the two attendants and by a third witness to the hold-up. Cf. Russell v. United States, 133 U.S.App.D.C. 77, 408 F.2d 1280 (1969). The jury returned a verdict of guilty.

Immediately before trial, appellant had indicated his intention to rely on a defense of non-responsibility, and moved for a mental examination at St. Elizabeths Hospital. Rather than delaying the trial on the merits, the district court concluded that the question of responsibility could be deferred to a separate hearing which would be held when and if the jury determined that the appellant had committed the acts in question. Cf. United States v. Bennett, 148 U.S.App. D.C. 364 at 370–374, 460 F.2d 872, 878–882 (1972), (advantages of bifurcation). Upon the return of the jury verdict, the trial court ordered appellant committed to St. Elizabeths for a mental examination.

On April 8, 1970, the hospital reported that appellant was not suffering from a mental disease or defect and that the offense was not the product of an abnormal condition of the mind. The report did point out, however, that appellant was suffering from "Drug Dependence, Heroin." One of the hospital's psychiatrists indicated in a separate report that he concurred in the diagnosis of Drug Dependence, Heroin. But in contrast to his colleagues, who were convinced that the condition had not impaired appellant's mental or emotional processes and behavior controls, he was "not sure of the extent to which [this abnormal condition of the mind] impaired [appellant's] behavior controls and affected his mental or emotional state."

On the grounds that the hospital's report was inadequate to permit counsel to prepare adequately for trial, appellant's counsel moved for an examination of appellant at government expense by a private psychiatrist. See 18 U.S.C. § 3006A. The motion was granted, and the private psychiatrist reported his findings as follows:

Patient seemingly has always been hard or difficult to manage or control. He has learned or profited little by experience, and has become callous or indifferent to society (or those around him). He is narcistic and egoistic caring little about any one but himself. This probably is the way the world looked to him. He is impulsive and his physical needs or desire are his concern and these must be met— hence his lack of control or judgment.

* Sitting by designation pursuant to 28 U.S. C. § 294(d) (1970).

1. 22 D.C.Code 2901, 3202, 502, 3204.

He has no ambition (expressed), no seriousness of purpose, and not able to identify with society or its laws. He is unable to accept the limits of reality, and must steal to up his salary to get the clothing he needs plus support his habit. He seems unable to profit by past experiences and there is no sense of guilt whatever in his behavior. His behavior seems to be rather an impulsive one.

Diagnosis—Psychopathic Personality (with strong impulsive overtones.)

A hearing was scheduled for September 24, 1970, but appellant could not be brought to court that day. The trial court explained:

I have been advised by the correctional people that Mr. Wilson today so resisted appearance in this court that he had to be put in irons and gas had to be used to quiet him. He therefore has not been brought up from the jail.

The trial judge also indicated that he was "wondering whether in view of the conduct of the defendant, which was reported to the court today, whether it may not be that this man is either sicker than he was, or is acting up, and that the thing to do would be perhaps get him back to St. Elizabeths."

Appellant was recommitted to the hospital that same day. On October 29, the hospital filed a new report, concluding that at the time of the alleged offense appellant was, after all, "suffering from a mental disease which substantially affected his emotional processes but not his mental processes and which substantially impaired his behavior controls." The report added, however, that "if the alleged offenses were committed by him, they were not the products of a mental disease or defect." The report also pointed out that appellant was receiving major tranquilizer medication, Thorazine, "100 milligrams twice a day." At the time of the earlier report, appellant was not under medication.

On December 7, 1970, the responsibility issue was tried to the district court sitting without a jury. Appellant was called to testify and he indicated that at the time of the offense he had been employed as a hotel night watchman, earning $59 per week. His drug habit at that time amounted to ten to fifteen heroin capsules per day at a cost of $1.50 each. Appellant also testified that he was suffering from withdrawal at the time of the offense: "I could get around, you know, but, I said my stomach was cramping, my nose was running, I was walking bent over."

Appellant's mother also testified for the defense. She stated that appellant's abnormal behavior could be traced to an incident when appellant was thirteen years old. At that time appellant was swimming with his brother, Otto.

Otto was pulled down, apparently by undertow, while swimming very close to [appellant]. [Appellant] grasped Otto's leg, but was unable to hold him. [Appellant] had been very close to Otto, who was two years older than him, and he looked up to him as a model. The incident troubled [appellant] deeply.[2]

Appellant's mother also referred to an incident in which Otto, apparently one of the first black children to be sent to a white school in the District of Columbia, was assaulted by a group of white boys. "He received a very serious knife wound in the leg requiring many stitches. [Appellant], who has repeatedly referred to this incident * * * was disturbed by it because Otto was such a well-behaved boy." Appellant's mother also explained:

I couldn't trust the other children around him, I couldn't leave them, because he would beat them up as soon as I would leave the house. They

2. The quotation is from an affidavit of appellant's mother, prepared prior to trial to support the defense motion for a mental examination, which was introduced in evidence by agreement of the parties. Appellant's mother elaborated on the affidavit in her oral testimony.

were afraid of him. His grandmother was afraid of him. His father was afraid of him. I tried and tried to get some psychiatric help for the boy. He was sent to Cedar Knolls; he still didn't get any help. In fact, I think he advanced more in crime when he went there. He has been in so many institutions with hardened criminals until his outlook on life just changed. There was nothing I could do. He was only seventeen when they first sent him away.

One of the staff psychiatrists at St. Elizabeths testified for the defense that appellant had a "severe antisocial reaction" which may be associated with "atrocious behavior, with loss of control of behavior, or some emotional difficulties." He also described the incident at the D.C. Jail that had prevented appellant's appearance at the hearing scheduled for September 24:

> [T]his patient did have an episode in the jail which did influence me in order to report this incident, because he has an additional—this loss of control, impulsivity, the episode in the jail when he threw the pipes and threatened to kill the guards and broke what I understood was windows and a toilet bowl and wash basin. They thought they might even be killed. He did throw the pipe in their direction. If they hadn't been careful, they might have been hurt seriously.

In response to the trial court's inquiry into the manifestations of appellant's "antisocial personality," the psychiatrist responded:

> Well, it is chronic habitual offenses against property, in the belief that he has the right to and he plans to steal what he wants and as he pleases, a disregard for the property of others, and a great hostility, inability to learn by experience, and loss of conscience, not feeling remorse about his actions.

The trial court also questioned the witness about the report by St. Elizabeths that the offenses allegedly committed by appellant were not the product of his abnormal condition.

THE COURT: Doctor, your letter indicates that it is the view of yourself and your colleagues that if the offense was committed by him, and it was— you can assume that it was committed by him because the jury has so found —if the offense was committed by him, it was not the product of a mental disease or defect; and yet you have described to the Court an individual who, you say, has an abnormal degree of hostility toward others.

THE WITNESS: Yes.

THE COURT: A feeling that he can assert himself in any way he wishes without remorse, and that he should, as he pleases, take property or commit violent acts.

I have some difficulty reconciling that with the statement that you made that the offense, itself, was not a product of the disease.

Could you indicate to me what it is you were trying to say in that letter?

THE WITNESS: Well, I believe that, beginning at the age of eight, maybe even earlier, he has had an antisocial pattern to his behavior, and what caused it, I don't know. But it is learned, it is habitual with him. It is not really impulsive. That there is, therefore—at the time of this alleged offense, this alleged antisocial act, his mental processes were impaired and that his behavior controls, as far as the act was concerned, were not impaired. Loss of impulse controls is fighting. This was a planned act; it wasn't impulsive.

THE COURT: I see. So you would say that his illness, so to speak, manifests itself in sort of extreme episodes of hostility or acting out under duress, but does not lead him to undertake and carry out a, so to speak, planned robbery of a filling station?

THE WITNESS: That is right.

THE COURT: So it was on that basis that you felt that though he had this difficulty, it wasn't at the root of what happened.

Along the same vein, the psychiatrist explained that appellant's condition

interfere[d] with his behavior controls. This antisocial reaction is associated with all kinds of antisocial activities, and that there is a loss of control over behavior. That is what the condition is. It is a behavior disorder. So that, by definition, he does not control behavior.

Q: If I understand you correctly, though, your testimony on direct examination was you do not find a relationship between his mental condition and the crime in question, is that correct?

A: Yes, because it was a learned pattern from his early years and most of the loss of control actually was, as I said earlier, in his explosiveness and fighting.

The private psychiatrist who had examined appellant previously testified that appellant was "a psychopathic personality with strong irresistible overtones and possible hypermanic reactions which is evidenced ever since he was a child." On the issue of productivity, or the relationship between the act and the impairment, the psychiatrist did not testify in conclusory terms. He explained that

an individual * * * with such characteristic behavior, given first of all a psychopathic personality, and having the strong impulsive overtones, almost what we would call hypermanic or irresistible impulse, his behavior, as far as I can see, is unpredictable. I don't know if anybody can tell what he would do from time to time or day to day or hour to hour.

\* \* \* \* \* \*

What I was trying to bring out in the first place was that when an individual has an irresistible impulse to do something, especially many drug addicts, the urge is there to carry out this impulse, and not until the impulse is carried out that the individual absolutely can relax. There is an inner urge to do something.

The private psychiatrist also testified about the impact of a drug dependence:

The drug is like a tail wagging a dog. If he decides he needs money, he is going to get it even if it means killing you or killing somebody. It isn't important who has the money. It is important that he wants it.

\* \* \* \* \* \*

[H]e becomes almost like a roving animal, goes through the city finding where he could attack, with whom he could attack, so as to get that drug at seven o'clock, so he won't have pains, he won't be upset by it.

After hearing this testimony, the court returned a verdict of guilty on the grounds that the government had "established beyond a reasonable doubt that there is no causal relation between the Defendant's mental illness and the offense \* \* \* ."

## II.

Appellant urges, first, that the conviction must be reversed because the evidence submitted at trial did not amount to proof beyond a reasonable doubt that he was criminally responsible for his act. Plainly, the evidence on the issue of productivity was in conflict. But we have often indicated our reluctance to disturb a jury verdict in this area because of the "complicated nature of the decision to be made—intertwining moral, legal, and medical judgments." [3] More recently, the matter was fully considered by this court sitting *en banc* in *United States* v. *Brawner*. There we

---

3. Adams v. United States, 134 U.S.App. D.C. 137, 142, 413 F.2d 411, 416 (1969), *quoting* King v. United States, 125 U.S. App.D.C. 318, 324, 372 F.2d 383, 389 (1967). *See also* United States v. Eichberg, 142 U.S.App.D.C. 110, 439 F.2d 620 (1971).

unanimously held that the determination of criminal responsibility requires, at least in part, the application of the *"underlying conceptions of ethics and justice shared by the community as expressed by its jury surrogate."* [4] (emphasis supplied)

Here to be sure, it was the trial court, and not a jury, that made the "intertwining moral, legal, and medical judgments." And in view of the jury's special qualification to act as spokesman for the community conscience, it may well be that the trial judge's resolution of the responsibility question deserves less deference than the judgment of a jury. But it is clear to us, in any case, that the record provides the support required by our previous case-law for the finding of the trial court that the act was not so proximately tied to the impairment as to require appellant's exculpation. For that reason we affirm the judgment of the district court.[5]

4. No. 22,714 (1972) (en banc), at 153 U.S. App.D.C. — at —, 471 F.2d 969 at 982. The author of this opinion separately urged that it is necessary to "focus the jury's attention on the legal and moral aspects of criminal responsibility, and to make clear why the determination of responsibility is entrusted to the jury and not the expert witnesses." *Brawner*, at 1032 of 471 F.2d (separate opinion). I have long held the view that the trial courts have an obligation to explain to the jury its role. In *Brawner*, the court sought to cast its standard of criminal responsibility in "language . . . sufficiently in the common ken that its use in the courtroom . . . permits . . . reasonable . . . communication." *Brawner*, at —, of 153 U.S.App.D.C., at 983 of 471 F.2d. In my view, "reasonable communication" to "focus the jury's attention on the legal and moral aspects of criminal responsibility" is accomplished by telling the jury to "evaluate [the defendant's] impairment in light of community standards of blameworthiness, to determine whether the . . . impairment makes it unjust to hold him responsible." United States v. Eichberg, 142 U.S.App.D.C. at 115, 439 F.2d at 625 (concurring opinion) ; *compare* United States v. Brawner, at — - —, — of 153 U.S.App.D.C., at — - —, 969 of 471 F.2d at 982–983; at — - — of 153 U.S.App.D.C., at 1030–1031 of 471 F.2d (separate opinion).

## III.

Appellant's final contention is that the sentence of imprisonment imposed on him by the district court amounted to cruel and unusual punishment in view of his alleged mental illness. The primary purpose of the responsibility defense is not simply to determine whether a defendant should be consigned to a prison or to a hospital. *Compare* B. Wooten, Crime & the Criminal Law (1963). Its primary function is to exculpate a defendant who cannot be considered blameworthy for his action. Accordingly, the disposition imposed by virtue of the success or failure of the responsibility defense is not necessarily the one best suited to the defendant's particular condition. Since acquittal by reason of insanity may mean only that the jury had reasonable doubt about the defendant's sanity, hospitalization is not necessarily the appropriate disposition. We have often recognized that problem because of

Since our deference to the jury rests upon a recognition of its special role, plainly, there can be no rational justification for withholding from the jury information so vital to the proper exercise of that role. If we are afraid to tell the jury what is expected of them, the conclusion is all but inescapable that our reliance on the jury should be reconsidered.

5. The author of this opinion would, however, remand this case for the reasons stated in my dissent to today's decision in United States v. Marshall, No. 23,436 (D.C.Cir. October 20, 1972). In the instant case, as in *Marshall*, the only issue effectively in dispute at trial was productivity. The product aspect of the *Durham* rule had been construed in a manner that permitted a distortion of the responsibility inquiry. It was for that reason that the court altered its formulation of the insanity defense in United States v. Brawner. I would accord to appellant, whose case was on direct appeal when *Brawner* was decided, the same treatment we afforded Brawner, a remand to the district court to determine whether there is a substantial possibility that appellant's insanity defense might have prevailed under the new formulation. The majority of this panel, relying on the *Brawner* court's holding that its alteration of the criminal responsibility test should be effective prospectively, rejects this approach.

the possibility, at least in theory, that a defendant might escape criminal sanctions by means of an insanity defense, and then escape hospitalization because his mental condition does not warrant it. *Cf.* Dixon v. Jacobs, 138 U.S.App.D.C. 319, 331, 427 F.2d 589, 601 (1970) (Leventhal, J., concurring). This case presents an analogous situation, arising not from the success of the responsibility defense, but from its failure. Appellant alleges that the disposition of his case—a sentence of imprisonment—is not only inappropriate, but also a violation of his rights under the eighth amendment.

At the conclusion of the trial, but before announcing its verdict, the trial court called attention to the problem at issue here:

> One of the difficult problems that these cases present is where a man has a mental illness and is in need of some regular medication, but he is not guilty by reason of insanity, it has frequently been difficult for the Court to arrange for or to get any assurance that medication will be given in a prison atmosphere. This is a situation which can be quite troublesome on occasions, because there may be people who need help but who perhaps are not commitable to St. Elizabeth's.

> \* \* \* \* \* \*

> This man has been on bread and water for frequent periods of time and in solitary confinement. If to some extent this results from a condition, a mental condition rather than from just obstreperousness, it presents \* \* \* the problem that is concerning the Court with respect to inappropriate type of humane care consistent with the requirements of the Eighth Amendment.

> \* \* \* \* \* \*

> [O]ur procedures have been less than totally humane in these borderline cases, and the problem of how to resolve that \* \* \* presents a matter of real concern to the Court, because were I not to accept this testimony

and conclude that the man is guilty, *some step has to be taken to give him the kind of medical attention that the proof shows his condition warrants.*

> \* \* \* \* \* \*

> DEFENSE COUNSEL: [T]here is no question that the Bureau of Prisons and the Department of Corrections have the authority to transfer a prisoner to a mental institution.

> THE COURT: I understand they have the authority.

> DEFENSE COUNSEL: But the fact of the matter is, they have not done it in this case.

> THE COURT: Whether I have the authority is what I am wondering about. I understand they have the authority by statute.

> \* \* \* \* \* \*

> They have the authority to do many things that the Court does not have the authority to do. Just as they have the authority to ignore my recommendations with respect to where they should be sent to prison or what kind of treatment they should get. I don't have any authority over that at all.

> (Emphasis added)

Before adjournment, the district court ordered the defendant committed forthwith to St. Elizabeths "until further order of the Court and to receive treatment."

Several months later the trial court announced its verdict rejecting the responsibility defense. At that time the court "propose[d] to take an action which will take into account the Defendant's obvious psychiatric problems." The court imposed a sentence of up to twenty years, but added:

> The Court is of the view that the Defendant is in serious need of psychiatric care, that he should not be committed to a penal institution that does not have adequate medical facilities for treatment and care of the Defendant. The Court has been advised that the correctional authorities, in view of

the experience that they have had with this man, are prepared to commit him to Springfield, which is the mental hospital within the prison correctional system. That is what the Court recommends and in view of the nature of this case, the Court directs that the Defendant remain at St. Elizabeths until action by the Attorney General or his representatives with respect to this recommendation. * * * *I am not going to send this man to a penal institution where he cannot get mental care.*

I would commit him to St. Elizabeths but I do not have the authority under any statute or any law to do so. I have searched and searched and can find none. Accordingly, this seems to be the only appropriate step to take. The Springfield institution is one created by the correctional authorities for mentally disturbed individuals and he will be incarcerated there until his progress is such that he can be returned to a regular rehabilitative prison institution. That is the sentence of the Court.

(Emphasis added.)

The district court acted with great sensitivity to the special problems of appellant. Although concluding that the appellant could be held blameworthy for his action—and that the responsibility defense must therefore fail—it made every effort to insure that appellant's penal sentence would be served in a setting where medical treatment would be available. Nevertheless, the authorities at the Springfield Medical Center quickly concluded that appellant did not belong in that institution. The Psychiatric Staff Examination Report indicated that appellant

has not at any time evidenced any psychotic behavior patterns or psychotic ideation. He has been on no medication during this time. Attempts to integrate the patient into a less structured milieu have met with failure because of the hostility and aggressiveness of the patient. It is felt at this time that this patient cannot benefit from any of the programs available at the Medical Center and that he is mainly a custodial and a behaviorial problem rather than a candidate for psychiatric therapy at this time.

The Transfer Report added that

Wilson is not psychotic, but suffers primarily from a character disorder, anti-social and sociopathic type. He is a very bitter, hostile, and angry young man who is potentially assaultive and dangerous. He appears to be very contemptuous of authority and undoubtedly will present a serious control problem throughout the remaining years of his incarceration. Wilson is distinctively lacking in motivation for self improvement programs and it does not appear foreseeable at this time that he will experience any immediate modification of his attitude and behavior. He has remained on the segregated ward throughout his stay at this institution primarily because of his tendency to act out aggressively. He does not require intensive psychiatric treatment at this time and likely would not respond favorably to the program of counseling, group or individual. His needs are such that he does not require retention in a hospital setting and we are recommending his immediate transfer from this facility. He has received no medication of a psychotropic nature since his arrival here.

Wilson was immediately transferred to the federal penitentiary at Lewisburg, Pennsylvania.

Through his counsel, appellant then petitioned the Attorney General to exercise his discretion under 18 U.S.C. § 4241 to transfer appellant to an "institution authorized by law to receive insane persons charged with or convicted of offenses against the United States." At the same time, appellant moved in this Court for an order directing the transfer of appellant to St. Elizabeths pending the appeal. A panel of this Court

concluded that the district court "has no general authority to direct that the appellant serve his sentence at Saint Elizabeths Hospital," but remanded the case to the district court for clarification of the state of the administrative proceedings under § 4241. United States v. Wilson, No. 71–1067 (D.C.Cir. Sept. 29, 1971).

Subsequently, an official in the Bureau of Prisons notified appellant's counsel that "[s]ince Mr. Wilson received a thorough psychiatric evaluation upon his commitment to Springfield, there would seem to be no reason to consider convening a board of examiners for a certification under Section 4241." In response to a request for clarification by appellant's counsel, the Bureau responded as follows:

I am advised by our mental health experts that to extend the provisions of Section 4241 to the character disorder which Mr. Wilson possesses would result in a virtually meaningless distinction between those who qualify for a regular institution and those who have been certified. The Medical Center for Federal Prisoners has been set aside as a place for the treatment of those persons who exhibit diagnosable psychotic symptoms. It has been estimated that 85% of our inmate population have debilitative psychological problems. The most common diagnosis among them is that of Mr. Wilson—a personality disorder, anti-social type. The consequences of the certification which you are requesting must also be kept in mind. An inmate so certified receives no good time allowance and therefore could be held until the maximum term of his sentence. Further, because of his potentially assaultive nature, a person like Mr. Wilson would have to be placed in a secure setting in the Medical Center.

At the remand hearing held pursuant to the order of this Court, the trial court made plain its frustration:

* * * I have tried in every way I know how to assist him with his personal problems, and I have spent long hours with you [defense counsel] and the probation office and with the correctional authorities.

You realize, I am sure, that we have no power. Our recommendations with respect to treatment of defendants are rarely followed. We have no authority to say where a person should be incarcerated or what treatment the person should get.

I would think at this stage the remedy that is available is a remedy that probably is available by a writ in the jurisdiction where the defendant is being held. In other words, a writ to the Federal Court that supervises that penitentiary, setting this problem up and asking that he receive what you feel is appropriate medication.

We have stated the facts on this appeal in very substantial detail not only because they are crucial to appellant's contention, but also because they raise deeply troubling questions about the effectiveness of our efforts to help the offender. Appellant has disrupted every institution through which he has passed: the District of Columbia Jail, St. Elizabeths Hospital, the Springfield Medical Center, and the Lewisburg Penitentiary. His counsel indicated that for many months, and perhaps through to the present time, appellant has been in the highest degree of segregation at Lewisburg, in an area which appellant describes as the "hole." Everyone agrees that appellant is suffering from a personality disorder, yet the Bureau of Prisons concludes that it cannot provide special care in a medical facility because Wilson's condition is indistinguishable from that of 85 percent of the prison population.

■ But while the facts of this case offer little reason to hope that Wilson's confinement will benefit him—or, in the long run, society—we share the district court's view that the only available remedy at this time is a petition for writ of habeas corpus in the jurisdiction in which appellant is confined. We reach

this conclusion reluctantly because of the obvious hardships it imposes on this indigent appellant, who must now initiate a separate proceeding. And we also recognize that our decision imposes additional burdens on appellant's court-appointed counsel, who has acted on appellant's behalf with great skill and perseverance since the trial first began. Nevertheless, the Attorney General's discretion in transferring appellant within the prison system is beyond the scope of our review in this proceeding. And while appellant unquestionably has the right to challenge the conditions of his confinement,[6] that challenge must be brought in the district of confinement. *See* Ahrens v. Clark, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948). The requirement that habeas corpus be sought in the district of confinement, except where otherwise provided by statute, has often been criticized on the grounds that the district of confinement is not necessarily the most convenient forum for the litigation.[7] In this case, however, the balance of convenience clearly points toward the district of confinement. We could only speculate on the merits of appellant's eighth amendment claim without a hearing to review the conditions of his present confinement, his present mental condition, the possibility of alternative forms of treatment, including drug therapy, and a number of other questions that can most efficiently be answered in the federal court in the district of confinement. Arguing against the choice of that forum is the difficulty of continued representation by appellant's counsel. We are hesitant to urge upon counsel the responsibility of representing appellant in another forum, perhaps without possibility of compensation. But in view of counsel's long involvement with this case and the high quality of his service, it would obviously be highly desirable if counsel could continue to act on behalf of appellant in any future litigation.

In short, we have no difficulty agreeing with counsel's assertion that appellant is "in a legal no-man's land, between the mentally ill who can be committed as civil patients and those who, having committed a crime, are found not criminally responsible. But he, too, should be given the benefit of whatever medical science can do for him, little though it apparently is." Reply Brief at 11–12. We are convinced, however, that no remedy is available in this Court, and accordingly we affirm the conviction without resolving on the merits appellant's claim under the eighth amendment.

So ordered.

SOBELOFF, Senior Circuit Judge, concurring:

I agree with my colleagues that the District Judge had facts before him to support his finding that Wilson's crime was not a "product" of his mental condition under the *Durham-McDonald* rule, which until recently was the insanity test in this circuit. That rule was abrogated in United States v. Brawner, No. 22,714, 153 U.S.App.D.C. ——, 471 F.2d 969 (1972) (*en banc*), and footnote 79 of the majority opinion in *Brawner* (at —— of 153 U.S.App.D.C., at 1005 of 471 F.2d) limited the new rule to prospective application only. If the question were an open one, I would be inclined to agree with Judge Bazelon that, as a matter of policy, *Brawner* should be ap-

---

6. *See, e. g.,* Coffin v. Reichard, 143 F.2d 443 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945); Note, Developments in the Law: Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1079–87 (1970) (Remedy: release from custody and review of prison conditions); *cf.* Creek v. Stone, 126 U.S.App.D.C. 329, 332, 379 F.2d 106, 109 (1967). Appellant also can proceed by an action under 42 U.S.C. § 1983. *See, e. g.,* Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark. 1969). *See generally* Note, The Role of the Eighth Amendment in Prison Reform, 38 U.Chi.L.Rev. 647 (1971).

7. *See, e. g.,* Note, Developments in the Law: Federal Habeas Corpus, 83 Harv. L.Rev. 1038, 1160–65 (1970).

1082

plied retroactively to this case which was in the "pipeline" when *Brawner* was handed down. This circuit *en banc* having decided otherwise, it would be most inappropriate for me as a visiting judge to suggest a departure from the clear statement of the law of the circuit as recently announced in footnote 79. Therefore, I concur in the affirmance of Wilson's conviction.

Also, I agree with the court's treatment of Wilson's claim that his incarceration at Lewisburg amounts to cruel and unusual punishment, the District Judge having found that Wilson suffered from a mental disease. Unfortunately, the Attorney General's discretion to transfer Wilson within the prison system is beyond review in this proceeding, and we have no jurisdiction over the conditions of appellant's incarceration, he being physically in Lewisburg, Pennsylvania. In these circumstances, Wilson's only recourse is a separate habeas corpus petition in the Middle District of Pennsylvania.

McGOWAN, Circuit Judge, concurring:

I concur in the result, and in parts I and III of Judge Bazelon's opinion.