# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 18, 2013        Decided February 11, 2014

No. 13-5223

SHAKER ABDURRAHEEM AAMER, DETAINEE, CAMP DELTA
AND SAEED AHMED SIDDIQUE, NEXT FRIEND OF SHAKER
ABDURRAHEEM AAMER,
APPELLANTS

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES OF
AMERICA, ET AL.,
APPELLEES

---

Consolidated with 13-5224, 13-5225, 13-5276

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:04-cv-02215)
(No. 1:05-cv-01504)
(No. 1:05-cv-02349)
(No. 1:05-cv-01457)

---

*Jon B. Eisenberg* argued the cause for appellants. With him on the brief were *Cori Crider* and *Tara Murray*. *Shayana D. Kadidal* entered an appearance.

2

*Daniel J. Lenerz*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, and *Douglas N. Letter* and *Matthew M. Collette*, Attorneys.

Before: TATEL and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Senior Circuit Judge* WILLIAMS.

TATEL, *Circuit Judge*: Petitioners Ahmed Belbacha, Abu Dhiab, and Shaker Aamer are detainees who, although cleared for release, remain held at the United States Naval Station at Guantanamo Bay, Cuba. Protesting their continued confinement, they and other similarly situated detainees have engaged in a hunger strike, refusing to eat unless and until released. In response, the government instituted a force-feeding protocol. Petitioners, each of whom had already sought release via a writ of habeas corpus, moved in those habeas actions for a preliminary injunction preventing the government from subjecting them to force-feeding. Two separate district judges denied their requests, each concluding that the Military Commissions Act (MCA) stripped federal courts of jurisdiction to consider such challenges brought by Guantanamo detainees. For the reasons set forth in this opinion, we conclude that under the law of this circuit petitioners' challenges to the conditions of their confinement properly sound in habeas corpus and thus are not barred by the MCA. We also conclude, however, that although their claims are not insubstantial, petitioners have failed to establish their entitlement to preliminary injunctive relief.

**I.**

A declaration submitted by the Senior Medical Officer at Guantanamo Bay summarizes the government's force-feeding protocol. According to the declaration, the protocol "follows the Federal Bureau of Prisons' model and guidelines for managing hunger strikers." Decl. of Commander [Redacted], M.D., 3. The medical staff at Guantanamo begins by designating a detainee as a "hunger striker . . . based on the detainee's intent, purpose, and behavior," the detainee's "[w]eight loss to a level less than 85% of the detainee's Ideal Body Weight," or the detainee's missing "nine consecutive meals." *Id.* Then, if "medical personnel determine the detainee's refusal to voluntarily consume adequate food or nutrients could now threaten his life or health," the detainee may be "approved for enteral feeding"—that is, force-feeding using "nasogastric tubes" inserted through the detainee's nose and into his stomach. *Id.* at 4. The declaration states that even after a detainee is approved for such treatment, "medical personnel will only implement enteral feeding when it becomes medically necessary to preserve a detainee's life and health." *Id.* The medical staff will also offer the detainee a final "opportunity to eat a standard meal or consume [a] liquid supplement orally, instead of being enterally fed." *Id.*

If the detainee refuses, officials will strap him to a "restraint chair." Decl. of Commander [Redacted], M.D., 5. The restraint chair, the declaration explains, "is ergonomically designed for the detainee's comfort and protection, with a padded seat and padded back support." *Id.* Once the detainee is restrained, "physicians or credentialed registered nurses" insert the "nasogastric tubes" through the detainee's nostril using a lubricant and, unless the detainee declines, "a topical anesthetic such as lidocane." *Id.* at 4. After medical personnel have verified that the tube has been properly placed in the detainee's stomach, "an appropriate amount of nutritional

supplement formula is infused by gravity." *Id*. The actual feeding process "typically takes 30 to 40 minutes." *Id.* Once the feeding is complete, the medical staff keeps the detainee strapped in the restraint chair for an additional period in order "to ensure the detainee has tolerated the feeding and to permit digestion of the nutritional formula." *Id.* at 5. "Detainees are offered pain relievers, such as ibuprofen, if they indicate any discomfort from the feeding procedure." *Id.*

Medical staff designated petitioners Dhiab, Belbacha, and Aamer as hunger strikers in March 2013. Decl. of Commander [Redacted], M.D., 7. The staff approved Dhiab for enteral feeding that same month, and Belbacha shortly thereafter. *Id.* A declaration submitted by petitioners' counsel reports that, as of May 30, 2013, medical personnel had regularly subjected Belbacha to force-feeding. *See* Crider Decl. 6. Belbacha stated that the process "hurt[] a great deal" and caused one of his nostrils to swell shut. *Id.* Dhiab, the same declaration recounted, had also been regularly force-fed—except when, because of "severe pain," he had instead voluntarily consumed a liquid supplement. *Id.* at 14, 17. Although Aamer was never approved for enteral feeding, apparently because he had been willing to consume the minimal amount of nutrition necessary to avoid such treatment, he asserted through counsel that "if force-feeding were not permitted, he would escalate his peaceful protest and refuse food." *Id.* at 12. The government has informed us that although neither Belbacha nor Aamer is currently designated as a hunger striker, Dhiab retains that designation. *See* Appellees' Letter Regarding Case Status, November 8, 2013; Appellees' Letter Regarding Case Status, October 24, 2013.

In June, petitioners—together with fellow Guantanamo detainee Nabil Hadjarab, who has since been released—invoked the district court's habeas jurisdiction and moved for

a preliminary injunction prohibiting the authorities from force-feeding them. According to petitioners, the practice violated both their constitutional rights and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1.

Judge Kessler considered Dhiab's petition separately from those of the other petitioners. Holding that section 7 of the Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600, had stripped the district courts of subject-matter jurisdiction over claims, such as Dhiab's, relating to the "conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant," she rejected the request for a preliminary injunction. *Dhiab v. Obama*, No. 05-1457, slip op. at 2 (D.D.C. July 8, 2013) (unpublished) (quoting 28 U.S.C. § 2241(e)(2)). She also observed, however, that "it is perfectly clear . . . that force-feeding is a painful, humiliating and degrading process." *Id.* at 3.

Judge Collyer subsequently denied the remaining petitioners' applications for a preliminary injunction. *Aamer v. Obama*, Nos. 04-2215, 05-1504, 05-2349, slip op. at 2 (D.D.C. July 16, 2013) (unpublished). Like Judge Kessler, she concluded that MCA section 7 stripped the courts of subject-matter jurisdiction over the detainees' claims. *Id.* at 12. Judge Collyer went on to explain that even if the court had jurisdiction, "the motion would be denied due to failure to show likelihood of success on the merits and because the public interest and balance of harms weighs in favor of the Government." *Id.* She reasoned that the government has "legitimate penological interest[s] in preventing suicide" and in "preserving order, security, and discipline," and that "the requested injunction would increase the risk of irreparable harm to Petitioners' lives and health." *Id.* at 13–14.

After both sets of petitioners appealed, we consolidated the cases. Petitioners assert, as they did in the district court, that their claims are properly raised in a petition for habeas corpus. They further contend that the two district courts should have granted them the preliminary relief they sought.

## II.

We begin, as we must, with the question of subject-matter jurisdiction. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101–02 (1998). The government contends, as both district courts held, that the MCA's jurisdiction-stripping provision bars federal courts from considering petitioners' force-feeding challenges. Our review is de novo. *Ass'n of Civilian Technicians v. FLRA*, 283 F.3d 339, 341 (D.C. Cir. 2002).

## A.

Congress and the Supreme Court have engaged in an extensive back-and-forth regarding the scope of federal court jurisdiction over claims brought by Guantanamo detainees. A brief review of this dialogue is necessary to understand the question now before us.

The story starts with *Rasul v. Bush*, 542 U.S. 466 (2004). In that case, several Guantanamo detainees had filed a petition for habeas corpus seeking "release from custody, access to counsel, freedom from interrogations, and other relief." *Id.* at 472. Other detainees, invoking the jurisdictional provisions of 28 U.S.C. §§ 1331 and 1350, sought "to be informed of the charges against them, to be allowed to meet with their families and with counsel, and to have access to the courts or to some other impartial tribunal." *Id.* The Supreme Court held that the district court had jurisdiction to hear all of these

claims. *Id.* at 483–85. It explained that 28 U.S.C. § 2241, the federal habeas corpus statute, extended to those detained at Guantanamo, which, for the purposes of this statute at least, was "within 'the territorial jurisdiction' of the United States." *Id.* at 480 (quoting *Foley Brothers, Inc. v. Cilardo*, 336 U.S. 281, 285 (1949)). The Court further concluded that if statutory habeas jurisdiction extended to Guantanamo, then there was no reason to bar detainees from also raising claims pursuant to sections 1331 and 1350: the detainees were entitled to "the privilege of litigation in U.S. courts." *Id.* at 484 (internal quotation marks omitted).

Shortly thereafter, Congress passed the Detainee Treatment Act of 2005 (DTA), Pub. L. No. 109-148, 119 Stat. 2739, which contained a provision designed to abrogate *Rasul* and strip federal courts of jurisdiction over Guantanamo detainees' claims. *See* DTA § 1005(e). After the Supreme Court held that this provision could not apply retroactively to cases pending at the time the DTA was enacted, *see Hamdan v. Rumsfeld*, 548 U.S. 557, 575–76 (2006), Congress responded by passing the MCA, the statute at issue in this case, whose jurisdiction-stripping provisions unequivocally applied to *all* claims brought by Guantanamo detainees. *See Boumediene v. Bush*, 553 U.S. 723, 736–39 (2008). MCA section 7 provides:

> (1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

(2) Except as provided [in section 1005(e) of the DTA], no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e).

Passage of the MCA required the Supreme Court to confront the constitutional question it had until then successfully avoided: may Congress eliminate federal habeas jurisdiction over Guantanamo without complying with the requirements of the Suspension Clause? In *Boumediene v. Bush*, 553 U.S. 723 (2008), the Court answered this question in the negative. It first held that the Suspension Clause "has full effect at Guantanamo Bay." *Id.* at 771. The Court then concluded that the substitute procedures Congress had developed for Guantanamo detainees—review in this court of military tribunal decisions—were "an inadequate substitute for habeas corpus," *id.* at 792, which at the very least "entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law" before a court that "must have the power to order the conditional release of an individual unlawfully detained," *id.* at 779 (quoting *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)). Thus, the Court held, MCA section 7 "operates as an unconstitutional suspension of the writ." *Id.* at 733, 792.

This court addressed *Boumediene*'s effect on the relevant jurisdictional statutes in *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009). In petitions for habeas corpus, nine detainees had sought to bar the government from transferring them to a country where they might be tortured or detained. *Id.* at 511. The government contended that the district court lacked jurisdiction to consider such claims, arguing that *Boumediene* held MCA section 7 to be "unconstitutional only insofar as it purported to deprive the district court of jurisdiction to hear a claim falling within the 'core' of the constitutional right to habeas corpus, such as a challenge to the petitioner's detention or the duration thereof." *Id.* at 512. Rejecting that argument, we held—in language central to this case—that *Boumediene* "invalidate[d] § 2241(e)(1) with respect to all habeas claims brought by Guantanamo detainees, not simply with respect to so-called 'core' habeas claims." *Id.* Thus, the Supreme Court's decision had "necessarily restored the status quo ante, in which detainees at Guantanamo had the right to petition for habeas under § 2241." *Id.* at 512 n.2. Because the federal courts' statutory habeas jurisdiction had been restored, we saw "no need to decide . . . whether the . . . petitions c[a]me within the contours and content of constitutional habeas." *Id.* (internal quotation marks omitted). Rather, the question was simply whether the petitioners had "allege[d] a proper claim for habeas relief." *Id.* at 513. We concluded that they had. *Id.*

Subsequently, in *Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012), we clarified that section 2241(e)(2)—the *other* subsection of MCA section 7—continues in force. In *Al-Zahrani*, which involved a suit brought by families of detainees who had died at Guantanamo, *id.* at 316–17, we held that the district court lacked jurisdiction because the "litigation rather plainly constitute[d] an action other than habeas corpus brought against the United States and its agents

relating to 'aspect[s] of the detention . . . treatment . . . [and] conditions of confinement of an alien' as described in the MCA," *id.* at 319. *Boumediene*, we explained, dealt with section 2241(e)(1), which stripped federal courts of habeas jurisdiction. *Id.* By contrast, section 2241(e)(2) "has no effect on habeas jurisdiction," and thus the "Suspension Clause is not relevant and does not affect the constitutionality of the statute." *Id.* We went on to reject the plaintiffs' claim that section 2241(e)(2) was itself unconstitutional, observing that the only remedy sought by the plaintiffs was money damages and that "such remedies are not constitutionally required." *Id.*

**B.**

*Kiyemba* and *Al-Zahrani* make clear that the jurisdictional question we consider here is relatively narrow: are petitioners' claims the sort that may be raised in a federal habeas petition under section 2241? As the government emphasizes, petitioners challenge neither the fact nor the duration of their detention, claims that would lie at the heart of habeas corpus. *See, e.g.*, *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he traditional function of the writ is to secure release from illegal custody."). Instead, they attack the conditions of their confinement, asserting that their treatment while in custody renders that custody illegal—claims that state and federal prisoners might typically raise in federal court pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). But although petitioners' claims undoubtedly fall outside the historical core of the writ, that hardly means they are not a "proper subject of statutory habeas." *Kiyemba*, 561 F.3d at 513. "Habeas is not 'a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose.'" *Boumediene*, 553 U.S. at 780 (quoting *Jones v. Cunningham*, 371 U.S. 236, 243 (1963)).

If, as petitioners assert, their claims fall within the scope of habeas, then the district courts possessed jurisdiction to consider them because the federal habeas corpus statute extends, in its entirety, to Guantanamo. *See Kiyemba*, 561 F.3d at 512 & n.2. But if petitioners' claims do not sound in habeas, their challenges "constitute[] an action other than habeas corpus" barred by section 2241(e)(2). *Al-Zahrani*, 669 F.3d at 319.

Contrary to the contentions of the government and the dissent, in order to resolve this jurisdictional question we have no need to inquire into Congress's intent regarding federal court power to hear Guantanamo detainees' claims. Although Congress undoubtedly intended to preclude federal courts from exercising jurisdiction over *any* claims brought by Guantanamo detainees, it chose to do so through a statute that separately proscribes two different sorts of challenges: "habeas" actions, *see* 28 U.S.C. § 2241(e)(1), and all "other" actions, *see id.* § 2241(e)(2). *Boumediene* struck down the first of these—the provision that would, but for *Boumediene,* preclude Guantanamo detainees from bringing habeas actions. *See Kiyemba*, 561 F.3d at 512. The remaining, lawful subsection of MCA section 7 has, by its terms, "no effect on habeas jurisdiction." *Al-Zahrani*, 669 F.3d at 319. In the wake of *Boumediene* and this court's interpretation of that decision in *Kiyemba*, Congress might very well want to preclude Guantanamo detainees from bringing particular types of habeas actions. But even assuming that Congress intends to again strip federal courts of habeas jurisdiction, it has yet to do so. Because we are unable to give effect to a non-existent statute, any such unmanifested congressional intent has no bearing on whether petitioners may bring their claims. Instead, given that statutory habeas extends to Guantanamo, the issue now before us is not Guantanamo-specific. We ask simply whether a challenge such as that advanced by

petitioners constitutes "a proper claim for habeas relief" if brought by an individual in custody in Guantanamo or elsewhere. *Kiyemba*, 561 F.3d at 513.

For the same reasons, we have no need to explore the reach or breadth of the Suspension Clause. Simply put, there is no longer any statute in place that might unconstitutionally suspend the writ. We express no view on whether Congress could constitutionally enact legislation designed to preclude federal courts from exercising jurisdiction over the particular species of habeas claim petitioners advance. For our purposes, it suffices to say that Congress has not done so. Moreover, because of our focus on statutory habeas corpus, we have less need in this case to examine the writ's scope at the time the Constitution was ratified than we might in a case in which the constitutional question was presented. *Compare St. Cyr*, 533 U.S. at 301 ("[A]t the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'") (quoting *Felker v. Turpin*, 518 U.S. 651, 664 (1996)), *with Rasul*, 542 U.S. at 474 ("As it has evolved over the past two centuries, the habeas statute clearly has expanded habeas corpus 'beyond the limits that obtained during the 17th and 18th centuries.'") (quoting *Swain v. Pressley*, 430 U.S. 372, 380 n.13 (1977)). It is to the question of the current scope of statutory habeas corpus that we now turn.

## C.

The Supreme Court once suggested—indeed, held—that the scope of the writ encompasses conditions of confinement claims such as those petitioners assert. In *Johnson v. Avery*, 393 U.S. 483 (1969), the Court permitted a federal prisoner to challenge by writ of habeas corpus a prison regulation that prohibited him from providing legal assistance to other prisoners. *See id.* at 484, 490. Likewise, in *Wilwording v. Swenson*, 404 U.S. 249 (1971), the Court expressly held that a

petition brought by state prisoners challenging "their living conditions and disciplinary measures," *id.* at 249, was "cognizable in federal habeas corpus," *id.* at 251.

Subsequently, however, in *Preiser v. Rodriguez*, 411 U.S. 475 (1973), the Supreme Court reversed course, opting instead to treat as an open question the writ's extension to conditions of confinement claims. In *Preiser*, the Court addressed the scope of relief state prisoners may seek under the federal civil rights statute, 42 U.S.C. § 1983. The Court held that when a challenge falls within the "heart of habeas corpus," *id.* at 498, state prisoners may not proceed by way of a section 1983 action, as otherwise they could evade the exhaustion and other procedural requirements established for state habeas challenges in the federal courts. *Id.* at 489–90. Claims that fall within the "heart" or "core" of habeas corpus, and thus may be brought in federal court solely by means of a petition for the writ, are those in which a prisoner "challeng[es] the very fact or duration of his physical imprisonment." *Id.* at 500. Significantly, the Court did not hold that the converse is also true—that is, that any claim challenging something apart from the fact or duration of confinement may not be raised in habeas. To the contrary, citing both *Johnson* and *Wilwording*, the Court stated: "This is not to say that habeas corpus may not also be available to challenge . . . prison conditions." *Preiser*, 411 U.S. at 499. But according to the Court, its prior decisions had left this question unresolved. "When a prisoner is put under additional and unconstitutional restraints during his lawful custody," the Court explained, "*it is arguable* that habeas corpus will lie to remove the restraints making the custody illegal." *Id.* (emphasis added). *But see id.* at 505 (Brennan, J., dissenting) (stating that it was well-established that "a prisoner may challenge the conditions of his confinement by petition for writ of habeas corpus").

Since *Preiser*, the Court has continued—quite expressly—to leave this question open. In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Court left "to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself." *Id.* at 527 n.6. More recently, in *Boumediene* itself, the Court declined to "discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement." 553 U.S. at 792.

Although the Supreme Court has avoided resolving the issue, this circuit has not. Our precedent establishes that one in custody may challenge the conditions of his confinement in a petition for habeas corpus, and we must "adhere to the law of our circuit unless that law conflicts with a decision of the Supreme Court." *Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009).

Most important is our decision in *Hudson v. Hardy*, 424 F.2d 854 (D.C. Cir. 1970) ("*Hudson II*"). In *Hudson II*, an inmate in the District of Columbia jail sought relief from certain jail officials who he claimed subjected him to beatings and threats and deprived him of his right to practice his religion, among other things. *Id.* at 855; *see also Hudson v. Hardy*, 412 F.2d 1091, 1091 (D.C. Cir. 1968) ("*Hudson I*") (describing petitioner's claims). Responding to the government's argument that the case had become moot because the petitioner had since been transferred outside the jurisdiction, we held that even if the complaint could not be construed as a section 1983 claim for damages, the "core of [the inmate's] complaint when filed was an unlawful deprivation of liberty," and thus the petition was "in effect . . . for a writ of habeas corpus." *Hudson II*, 424 F.2d at 855. In language directly applicable to this case, we held: "Habeas

corpus tests not only the fact but also the form of detention." *Id.* at 855 n.3. If, we continued, the inmate's pleadings were treated as a petition for habeas corpus, then the case might not be moot for a number of reasons, among them that the inmate's "disciplinary record may follow him throughout the prison system" in a manner that could both lead to harsher treatment while he was incarcerated and "affect his eligibility for parole." *Id.* at 856. We therefore remanded for the district court to ascertain whether, if the petition was for habeas corpus, as opposed to a claim for damages, the inmate was "still subject to disabilities because of the unlawful acts alleged." *Id.* at 856.

*Hudson II*'s description of the writ's availability to test "not only the fact but also the form of detention" was integral to our ultimate disposition of the case, and thus constitutes binding precedent. If habeas jurisdiction would not lie over the inmate's claims, we would have had no need to direct the district court to conduct further proceedings regarding the mootness of any such habeas petition. We based the necessary antecedent conclusion regarding habeas jurisdiction on two premises: that the petitioner attacked the conditions of his confinement while in custody; and that such claims may be raised in habeas corpus. Doing so quite explicitly, we held that the inmate's petition—which, again, alleged that jail officials "had subjected him to cruel and unusual punishment, to punishment without cause, and to unconstitutional discrimination," *Hardy II*, 424 F.2d at 855—was "for a writ of habeas corpus" because "[h]abeas corpus tests not only the fact but also the form of detention." *Id.* at 855 & n.3. Indeed, unless we were holding that habeas jurisdiction would lie for this purpose, we could not have offered as a potential justification for the continued existence of a live controversy the possibility that the disciplinary record would subject petitioner to harsher treatment while in prison, *see id.* at

856—an independent, and therefore precedential, basis for our remand. *See Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum.").

The dissent seeks to avoid this conclusion in three ways. First, the dissent asserts that because we remanded for the district court to make findings as to mootness, we could not have issued a precedential decision as to whether the petitioner's claims sounded in habeas, for by doing so we would have "flouted the rule that on any appeal 'the first and fundamental question is that of jurisdiction.'" Dissenting Op. at 3 (quoting *Steel Co.*, 523 U.S. at 94). But the habeas statute is jurisdictional, *see Rasul*, 542 U.S. at 484, so whether a claim is the type that sounds in habeas is itself a jurisdictional question, *see Wolfish*, 441 U.S. at 527 n.6, *Kiyemba*, 561 F.3d at 513, and "there is no mandatory sequencing of jurisdictional issues." *Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422, 431 (2007). Just as plaintiffs invoking federal question jurisdiction must assert claims that turn on questions of federal law, petitioners invoking habeas jurisdiction must assert claims that sound in habeas. Simply labeling the latter requirement "the merits of whether a claim is cognizable in habeas," *see* Dissenting Op. at 4, does not somehow transform it into a merits issue. Next, the dissent points out that in *Hudson II* we suggested that the petitioner could seek injunctive relief pursuant to section 1983. *See id.* at 5; *Hudson II*, 424 F.2d at 855 n.3. True, but we also held that the petitioner could raise his claims by way of a petition for habeas corpus, and again, alternative grounds for a decision are nonetheless precedential. *See Woods*, 337 U.S. at 537. Finally, the dissent thinks it "unclear whether [*Hudson II*] addresses conditions of confinement at all," and advances various other potential rationales that we could have

offered for concluding that habeas jurisdiction existed. Dissenting Op. at 6. But the dissent misreads *Hudson II*'s discussion of mootness. Contrary to the dissent's contention, we cited the inmate's transfer to Leavenworth prison not as an "example of future punishment," *id.*, but rather as an independent reason that his petition might not be moot, *see Hudson II*, 424 F.2d at 856. We mentioned being "subjected to . . . additional restraints" as an example of the petitioner being "punished anew." *Id.* at 856 & n.7. And in any event, we based our determination that habeas jurisdiction existed on none of the justifications offered by the dissent. Instead, we clearly held that the petitioner's claim sounded in habeas because "[h]abeas corpus tests not only the fact but also the form of detention." *Id.* at 855 n.3. We cannot now disregard this holding simply by inventing alternative rationales on which *Hudson II* could have relied; we are bound by the rationale on which *Hudson II* did rely.

*Hudson II*'s characterization of the scope of habeas corpus is by no means an outlier in this circuit's jurisprudence—even if it is the only decision that is precedential on that precise question. We invoked the very same principle in *United States v. Wilson*, 471 F.2d 1072 (D.C. Cir. 1972). In that case, a defendant, on direct appeal from his conviction, claimed that his sentence of imprisonment amounted to cruel and unusual punishment given his mental illness. *Id.* at 1077. Rejecting his claim, we reasoned "that the only available remedy at this time is a petition for writ of habeas corpus in the jurisdiction in which appellant is confined." *Id.* at 1080. Although holding that such a petition would have to be "brought in the district of confinement"—which was located outside this court's jurisdiction—we left little doubt that petitioners' claims could be raised in habeas, stating: "appellant unquestionably has the

right to challenge the conditions of his confinement." *Id.* at 1081.

Equally significant is *Miller v. Overholser*, 206 F.2d 415 (D.C. Cir. 1953), which involved a habeas petitioner who sought transfer from an institution for the criminally insane to an institution for treatment of the mentally ill. Here the government cites *Miller* for the proposition that "'the courts will not interfere with discipline or treatment in a place of legal confinement, and so habeas corpus is not an available remedy.'" Appellees' Br. 12 (quoting *Miller*, 206 F.2d at 419). But the government has excised the key phrase from the quoted sentence, thus completely changing its meaning. In fact, *Miller* clearly supports petitioners, as the full sentence reads: "*Except in circumstances so extreme as to transgress constitutional prohibitions*, the courts will not interfere with discipline or treatment in a place of legal confinement, and so habeas corpus is not an available remedy." *Miller*, 206 F.2d at 419 (emphasis added); *cf. also Creek v. Stone*, 379 F.2d 106, 109 (D.C. Cir. 1967) ("[I]n general habeas corpus is available not only to an applicant who claims he is entitled to be freed of all restraints, but also to an applicant who protests his confinement in a certain place, or under certain conditions, that he claims vitiate the justification for confinement.").

During oral argument, the government asserted that our decisions recognize only that a habeas petitioner may challenge the *place* of confinement, not the conditions therein. It is true that the petitioner in *Miller* alleged that his confinement in a particular place was illegal. *See Miller*, 206 F.2d at 419. But neither *Hudson II* nor *Wilson* was so limited. Not only did petitioners in both cases directly attack their treatment while in custody, but we made no mention of the possibility that they might instead be detained in a different place in which such conditions were absent.

In any event, we see little reason to distinguish a place of confinement challenge, which unquestionably sounds in habeas, *see, e.g.*, *Kiyemba*, 561 F.3d at 513; *In re Bonner*, 151 U.S. 242, 255–56 (1894), from the one presented here. The substantive inquiry in which courts engage in the two types of cases will often be identical. A place of confinement claim such as that asserted in *Miller* rests on the contention that the conditions of confinement in a particular place violate the law. *See Miller*, 206 F.2d at 418–19 (holding that, if true, the facts alleged by petitioner regarding the conditions where he was held demonstrated his confinement in that place was "not authorized by . . . statute"); *see also Covington v. Harris*, 419 F.2d 617, 624 (D.C. Cir. 1969) (habeas petitioner's challenge to his placement in a particular ward within a hospital turned on the validity of "additional restrictions beyond those necessarily entailed by hospitalization," which "are as much in need of justification as any other deprivations of liberty"). A conditions of confinement claim involves the very same inquiry: do the conditions in which the petitioner is currently being held violate the law? *See Wilson*, 471 F.2d at 1080; *Hudson II*, 424 F.2d at 855.

The principal functional difference between the two sorts of challenges lies in the relief that a court might grant. In a place of confinement claim, the petitioner's rights may be vindicated by an order of transfer, while in a conditions of confinement claim, they may be vindicated by an order enjoining the government from continuing to treat the petitioner in the challenged manner. But even this distinction is largely illusory, as either of these two forms of relief may be reframed to comport with the writ's more traditional remedy of outright release. That is, in both types of cases, a court may simply order the prisoner released unless the unlawful conditions are rectified, leaving it up to the

government whether to respond by transferring the petitioner to a place where the unlawful conditions are absent or by eliminating the unlawful conditions in the petitioner's current place of confinement. *See Bonner*, 151 U.S. at 262 (directing that the writ should issue in favor of petitioner illegally held in state penitentiary, but "without prejudice to the right of the United States to take any lawful measures to have the petitioner sentenced" to proper place of detention); *Miller*, 206 F.2d at 419–20 (discussing the remedy imposed in *Bonner*); *cf. Brown v. Plata*, 131 S. Ct. 1910, 1922–23 (2011) (upholding order remedying Eight Amendment violations by ordering state to reduce overcrowding in its prisons by releasing prisoners if necessary). Given that habeas is not a "formalistic remedy," *Boumediene*, 553 U.S. at 780 (internal quotation marks omitted), and "must not be circumscribed by any technical considerations," *Miller*, 206 F.2d at 420, it should come as little surprise that this court has never engaged in the sort of formalistic, technical line-drawing that the government's approach would demand.

Indeed, as *Miller* illustrates, the near-complete overlap between these two sorts of challenges ultimately reflects the fact that in this circuit the underlying rationale for exercising habeas jurisdiction in either case is precisely the same. *Miller* relied on *Coffin v. Reichard*, 143 F.2d 443 (6th Cir. 1944), which involved a habeas petition alleging "assaults, cruelties and indignities from guards and . . . co-inmates." *Id.* at 444. *Coffin* unequivocally held that a habeas court has jurisdiction over such conditions of confinement claims and "may remand with directions that the prisoner's retained civil rights be respected." *Id.* at 445. In *Miller*, we cited *Coffin* for the proposition that "[a] prisoner is entitled to the writ of habeas corpus when, though lawfully in custody, he is deprived of some right to which he is lawfully entitled even in his confinement, the deprivation of which serves to make his

imprisonment more burdensome than the law allows or curtails his liberty to a greater extent than the law permits." *Miller*, 206 F.2d at 420 (quoting *Coffin*, 143 F.2d at 445) (internal quotation marks omitted). We grounded our holding that the petitioner could challenge the place of his confinement on this same proposition. *See id.* Our logic was straightforward: in either a conditions of confinement or place of confinement case, the petitioner contends that some aspect of his confinement has deprived him of a right to which he is entitled while in custody. The availability of habeas for both types of challenges simply reflects the extension of the basic principle that "[h]abeas is at its core a remedy for unlawful executive detention." *Munaf v. Geren*, 553 U.S. 674, 693 (2008); *see* 28 U.S.C. § 2241(c)(3) (the writ extends to those prisoners "in custody in violation of the Constitution or laws or treaties of the United States"). The illegality of a petitioner's custody may flow from the fact of detention, *e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 467–68 (1938), the duration of detention, *e.g.*, *Preiser*, 411 U.S. at 487, the place of detention, *e.g.*, *Miller*, 206 F.2d at 419, or the conditions of detention, *e.g.*, *Hudson II*, 424 F.2d at 855 n.3. In all such cases, the habeas petitioner's essential claim is that his custody in some way violates the law, and he may employ the writ to remedy such illegality. As a law review note cited in both *Preiser*, 411 U.S. at 499, and *Wilson*, 471 F.2d at 1081 n.7, put it: "Where the specific detention abridges federally protected interests—by placing petitioner in the wrong prison, denying him treatment, imposing cruel and unusual punishment, impeding his access to the courts, and so on—it is an unlawful detention *and habeas lies to release the petitioner therefrom*." Note*, Developments in the Law— Federal Habeas Corpus*, 83 HARV. L. REV. 1038, 1085 (1970) (emphasis added).

This circuit is by no means alone in adopting this reasoning. Several of our sister circuits have concluded that an individual in custody may utilize habeas corpus to challenge the conditions under which he is held. *See, e.g.*, *United States v. DeLeon*, 444 F.3d 41, 59 (1st Cir. 2006) ("If the conditions of incarceration raise Eighth Amendment concerns, habeas corpus is available."); *Kahane v. Carlson*, 527 F.2d 492, 498 (2d Cir. 1975) (Friendly, J., concurring) (contending that section 2241 would furnish "a wholly adequate remedy" for a federal prisoner who sought orders requiring prison officials to accommodate his First Amendment right to free exercise of religion); *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) ("This court has long interpreted § 2241 as applying to challenges to the execution of a federal sentence, including such matters as the . . . type of detention and prison conditions." (internal quotation marks omitted)); *Woodall v. Federal Bureau of Prisons*, 432 F.3d 235, 242 & n.5 (3d Cir. 2005) (holding that prisoner's challenge to regulations limiting opportunity for placement in community confinement could proceed by way of habeas corpus "even if what is at issue . . . is 'conditions of confinement'"); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978) ("At most [petitioner's] claims rise to a possible habeas attack on the conditions of confinement, cognizable in a federal habeas action only in extreme cases."); *Coffin*, 143 F.2d at 444 ("Any unlawful restraint of personal liberty may be inquired into on habeas corpus."); *Adams v. Bradshaw*, 644 F.3d 481, 482–83 (6th Cir. 2011) (holding that a state prisoner's Eighth Amendment challenge to the state of Ohio's lethal injection procedures could be brought in habeas); *cf. McNair v. McCune*, 527 F.2d 874, 875 (4th Cir. 1975) ("[I]t is a sufficient statement of federal jurisdiction in habeas corpus to redress punitive segregation imposed without a hearing for the relatively innocuous offense of 'wearing the wrong kind of clothing.'").

Of course, as the government emphasizes, other circuits have reached a contrary conclusion. But even if we had authority to depart from our own precedent, none of these decisions would provide a compelling reason to do so.

The Fifth Circuit appears to have relied on its own, long-standing precedent in holding that a habeas petitioner may not challenge his treatment while in custody. *See Cook v. Hanberry*, 592 F.2d 248, 249 (5th Cir. 1979) ("Habeas corpus is not available to prisoners complaining only of mistreatment during their legal incarceration.") (citing *Granville v. Hunt*, 411 F.2d 9, 12–13 (5th Cir. 1969)). This precedent originally rested, however, on the now-questionable rationale that the conditions of confinement are within the discretion of prison administrators and thus beyond the cognizance of the courts. *See Granville*, 411 F.2d at 12; *but see*, *e.g.*, *Procunier v. Martinez*, 416 U.S. 396, 405–06 (1974) ("When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.").

The other circuits that have reached a similar conclusion appear to have done so on the basis of an even more questionable rationale, one reflecting a fundamental misunderstanding of the Supreme Court's decision in *Preiser*. As recounted above, *see supra* at 13, *Preiser* imposed a habeas-channeling rule, not a habeas-*limiting* rule: the Court held only that claims lying at the "core" of the writ must be brought in habeas, and expressly disclaimed any intention of restricting habeas itself. *See Davis v. U.S. Sentencing Commission*, 716 F.3d 660, 662–63 (D.C. Cir. 2013); *accord Woodall*, 432 F.3d at 242 n.5; *Brennan v. Cunningham*, 813 F.3d 1, 4 (1st Cir. 1987); *see also Brown v. Plaut*, 131 F.3d 163, 168–69 (D.C. Cir. 1997) ("Habeas corpus might . . . be

available to bring challenges to . . . prison conditions . . . , but *requiring* the use of habeas corpus in such cases would extend *Preiser* far beyond the 'core' of the writ that *Preiser* set out to protect."). Although the Court made this emphatically clear, *see Preiser* 411 U.S. at 499–500, some circuits nonetheless have read the decision as limiting the sorts of claims that may be brought in habeas and to preclude prisoners from using the writ to attack the conditions of their confinement. *See Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991) (relying on *Preiser* for the proposition that if a prisoner "is challenging merely the conditions of his confinement his proper remedy is under the civil rights law"); *McIntosh v. United States Parole Comm'n*, 115 F.3d 809, 811 (10th Cir. 1997) (same); *cf. Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006) (describing *Preiser* line of cases as holding that habeas and section 1983 are "mutually exclusive"). Even more perplexing, some circuits have done so while completely overlooking their own post-*Preiser* precedent recognizing that conditions of confinement claims sound in habeas. *Compare Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996) (citing only *Preiser* in holding that "[i]f the prisoner is not challenging the validity of his conviction or the length of his detention . . . then a writ of habeas corpus is not the proper remedy"), *with Willis v. Ciccone*, 506 F.2d 1011, 1014 (8th Cir. 1974) ("[H]abeas corpus is a proper vehicle for any prisoner, state or federal, to challenge unconstitutional actions of prison officials."); *compare Crawford v. Bell*, 599 F.2d 890, 891–92 (9th Cir. 1979) (citing only *Preiser* and a district court decision describing *Preiser* in holding that a habeas petition challenging "the terms and conditions of [an inmate's] incarceration" must be dismissed), *with Workman v. Mitchell*, 502 F.2d 1201, 1208 n.9 (9th Cir. 1974) (holding it to be "fairly well established" that "federal habeas corpus actions are now available to deal with questions concerning both the duration and the conditions of confinement").

In sum, although the Supreme Court has left the question open, the law of this circuit—which is consistent with the weight of the reasoned precedent in the federal Courts of Appeal—compels us to conclude that a prisoner may, in a federal habeas corpus petition, "challenge the conditions of his confinement." *Wilson*, 471 F.2d at 1081. Petitioners here advance just such a challenge. They raise claims that their force-feeding at the hands of their jailers constitutes an "additional and unconstitutional restraint[] during [their] lawful custody," *Preiser*, 411 U.S. at 499, and violates their fundamental right to religious freedom, *see* 42 U.S.C. § 2000bb-1, thus rendering their "imprisonment more burdensome than the law allows or curtail[ing] [their] liberty to a greater extent than the law permits." *Miller*, 206 F.2d at 420 (quoting *Coffin*, 143 F.2d at 445); *see also Reed v. Farley*, 512 U.S. 339, 347–48 (1994) (describing availability of federal habeas corpus for fundamental nonconstitutional claims). They have therefore brought "a proper claim for habeas relief" over which the district courts possess subject-matter jurisdiction. *Kiyemba*, 561 F.3d at 513. We thus turn to the question of whether petitioners have established their entitlement to injunctive relief.

**III.**

"'A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (alteration in original) (quoting *Winter v. National Resource Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). We review the district court's balancing of these four factors for abuse of

discretion, while reviewing de novo the questions of law involved in that inquiry. *Id.* at 393.

## A.

We begin with the first and most important factor: whether petitioners have established a likelihood of success on the merits. Petitioners advance two separate substantive claims regarding the legality of force-feeding.

Their first and central claim is that the government's force-feeding of hunger-striking detainees violates their constitutionally protected liberty interest—specifically, the right to be free from unwanted medical treatment, *see Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278–79 (1990)—and that the government is unable to justify the practice of force-feeding under the standard established in *Turner v. Safley*, 482 U.S. 78 (1987). In *Turner*, the Supreme Court set forth the general test for assessing the legality of a prison regulation that "impinges on" an inmate's constitutional rights, holding that such a regulation is "valid if it is reasonably related to legitimate penological interests." *Id.* at 89. As the government does not press the issue, we shall, for purposes of this case, assume without deciding that the constitutional right to be free from unwanted medical treatment extends to nonresident aliens detained at Guantanamo and that we should use the *Turner* framework to evaluate petitioners' claim. *But cf. Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009), *vacated by Kiyemba v. Obama*, 559 U.S. 131 (2010), *modified and reinstated*, 605 F.3d 1046, 1048 (D.C. Cir. 2010).

In their briefs, petitioners detail the significant number of international organizations, medical associations, and public figures who have criticized the practice of force-feeding prisoners unwilling to eat. Appellants' Br. 33–39 (citing, *inter*

*alia*, World Medical Association, <u>WMA Declaration of Malta on Hunger Strikers</u> (1991); International Committee of the Red Cross, <u>Hunger strikes in prisons: the ICRC's position</u> (2013); Letter from Senator Dianne Feinstein to Secretary of Defense Chuck Hagel (June 19, 2013), *available at:* http://www.feinstein.senate.gov/public/index.cfm/files/serve/? File_id=17585d4b-c235-4f32-b957-50648d4e6252). Since oral argument in this case, a task force organized by the Institute on Medicine as a Profession and the Open Society Foundation has issued a scathing report detailing the abuses of medical ethics in the government's treatment of detainees in Guantanamo, Afghanistan, and Iraq, concluding specifically that doctors who assist in the treatment of hunger-striking Guantanamo detainees "have become agents of a coercive and counter-therapeutic procedure that for some detainees continued for months and years, resulting in untold pain, suffering, and tragedy for the detainees for whom they were medically responsible." Task Force Report, <u>Ethics Abandoned: Medical Professionalism and Detainee Abuse in the War on Terror</u> 84 (2013) (submitted by petitioners pursuant to Fed. R. App. P. 28(j)); *see also* Denise Grady & Benedict Carey, *Medical Ethics Have Been Violated at Detention Sites, a New Report Says*, N.Y. TIMES, Nov. 5, 2013, at A16 (describing the task force's report). Given these authorities—and, we might add, given the government's own description of its force-feeding protocol—we have no doubt that force-feeding is a painful and invasive process that raises serious ethical concerns.

For petitioners to be entitled to injunctive relief, however, it is not enough for us to say that force-feeding may cause physical pain, invade bodily integrity, or even implicate petitioners' fundamental individual rights. This is a court of law, not an arbiter of medical ethics, and as such we must view this case through *Turner*'s restrictive lens. The very

premise of *Turner* is that a "prison regulation [that] impinges on inmates' constitutional rights" may nonetheless be "valid." *Turner*, 482 U.S. at 89. That is, although "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," they do substantially change the nature and scope of those constitutional protections, as well as the degree of scrutiny that courts will employ in assessing alleged violations. *Id* at 84; *see Price v. Johnston*, 334 U.S. 266, 285 (1948) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."). Thus, even if force-feeding "burdens fundamental rights," *Turner*, 482 U.S. at 87, *Turner* makes clear that a federal court may step in only if the practice is not "reasonably related to legitimate penological interests," *id.* at 89.

The government has identified two penological interests at stake here: preserving the lives of those in its custody and maintaining security and discipline in the detention facility. As the government emphasizes, many courts have concluded that such interests are legitimate and justify prison officials' force-feeding of hunger-striking inmates. *E.g.*, *In re Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998); *Garza v. Carlson*, 877 F.2d 14, 17 (8th Cir. 1989); *Matter of Bezio v. Dorsey*, 989 N.E.2d 942, 950–51 (N.Y. 2013); *Laurie v. Senecal*, 666 A.2d 806, 809 (R.I. 1995). The New York Court of Appeals recently explained that prison officials faced with a hunger-striking inmate whose behavior is life-threatening would, absent force-feeding, face two choices: (1) give in to the inmate's demands, which would lead other inmates to "copy the same tactic, manipulating the system to get a change in conditions"; or (2) let the inmate die, which is a harm in its own right, and would often "evoke[] a strong reaction from the other inmates

and create[] serious safety and security concern[s]." *Matter of Bezio*, 989 N.E.2d at 951 (internal quotation marks omitted); *accord Freeman v. Berge*, 441 F.3d 543, 547 (7th Cir. 2006) ("If prisoners were allowed to kill themselves, prisons would find it even more difficult than they do to maintain discipline, because of the effect of a suicide in agitating the other prisoners."). Although a handful of state appellate courts have rejected prison officials' attempts to force-feed particular inmates, those courts have largely done so while applying state law and under unique factual circumstances. *See Hill v. Dept. of Corrections*, 992 A.2d 933, 938 (Pa. Commw. Ct. 2010) (recognizing that state's interests generally "outweigh any privacy right" claimed by a force-fed inmate, but holding that state had failed to show inmate's life "was in imminent danger absent forced nutrition and hydration"); *Thor v. Superior Court*, 855 P.2d 375, 387–88 (Cal. 1993) (holding, under California law, that quadriplegic prisoner could refuse surgical procedure that would insert feeding tube into his stomach where there was "no evidence that allowing him to do so undermines prison integrity or endangers the public"); *Singletary v. Costello*, 665 So.2d 1099, 1109–10 (Fla. Dist. Ct. App. 1996) (holding that state's attempt to force-feed inmate would violate inmate's state constitutional right to privacy where there was "no evidence" that inmate's actions "undermined the security, safety or welfare within the prison," and observing that "[i]n another case, or with different evidence presented below, a different result may be reached"). *But see Zant v. Prevatte*, 286 S.E.2d 715, 717 (Ga. 1982) (holding that prison officials cannot force-feed mentally competent prisoner with no dependents). Some states, such as California, have also adopted policies pursuant to which inmates can escape force-feeding even if their lives are threatened so long as they clearly and competently refuse such treatment. *See* 4 California Correctional Health Care Services, Inmate Medical Services Polices & Procedures ch.

22.2, 4–5, *available at* http://www.cphcs.ca.gov/docs/imspp/IMSPP-v04-ch22.2.pdf. But such an approach is not constitutionally compelled because it fails to similarly achieve the government's legitimate penological interests—including, most obviously, the interest in preserving the inmate's life.

Thus, the overwhelming majority of courts have concluded, as did Judge Collyer and as we do now, that absent exceptional circumstances prison officials may force-feed a starving inmate actually facing the risk of death. *See Freeman*, 441 F.3d at 546; *Commissioner of Corrections v. Coleman*, 38 A.3d 84, 95–97 (Conn. 2012) (collecting cases). Petitioners point to nothing specific to their situation that would give us a basis for concluding that the government's legitimate penological interests cannot justify the force-feeding of hunger-striking detainees in Guantanamo.

Instead, petitioners attempt to distinguish the many decisions upholding the lawfulness of force-feeding by tying their challenge to an attack on the legality of the fact of their detention itself, arguing that "[t]here cannot be a legitimate penological interest in force-feeding the Guantanamo Bay detainees to prolong their indefinite detention" because force-feeding then simply "facilitates the violation of a fundamental human right." Appellants' Br. 40. But this court has repeatedly held that under the Authorization for the Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), individuals may be detained at Guantanamo so long as they are determined to have been part of Al Qaeda, the Taliban, or associated forces, and so long as hostilities are ongoing. *See, e.g.*, *Al-Bihani v. Obama*, 590 F.3d 866, 873–74 (D.C. Cir. 2010); *but cf. Ali v. Obama*, 736 F.3d 542, 553 (D.C. Cir. 2013) (Edwards, J., concurring in the judgment) (posing the "troubling question" of "whether the law of th[is] circuit has stretched the meaning of the" statutes justifying such

detention "far beyond [their] terms"). Given that such continued detention is lawful, force-feeding that furthers this detention serves the same legitimate penological interests as it would if petitioners were serving determinate sentences in state or federal prison.

In reaching this conclusion, we emphasize that we are addressing only petitioners' *likelihood* of success on the merits, not the actual merits of their claim. It is conceivable that petitioners could establish that the government's interest in preserving the lives of those detained at Guantanamo is somehow reduced, or demonstrate that the government has such complete control over Guantanamo detainees that hunger-striking inmates present no threat to order and security, or even show that there are "ready alternatives" to force-feeding that the government might employ to achieve these same legitimate interests. *Turner*, 482 U.S. at 90. We leave it to the district court to decide in the first instance what procedures may be necessary to provide petitioners a "meaningful opportunity" to make this showing. *Boumediene*, 553 U.S. at 779.

Finally, we reject petitioners' attempt to advance for the first time in their reply brief, and then again at oral argument, a very different ground for relief—that the government's force-feeding protocol must be enjoined not because force-feeding is inherently unconstitutional, but because the government subjects detainees to such treatment before they are actually at risk. As petitioners' counsel phrased this contention at oral argument: "[A] reasonable alternative would be to not force feed them until . . . they're at risk of death or permanent organ injury." Oral Arg. Tr. 16. But prior to their reply brief, the only "alternative" petitioners identified to the current force-feeding protocol was that the government bring petitioners to trial or set them free. Appellants' Br. 40.

Accordingly, this argument is forfeited. *See United States v. Van Smith*, 530 F.3d 967, 973 (D.C. Cir. 2008) ("We require petitioners and appellants to raise all of their arguments in the opening brief, and have repeatedly held that an argument first made in a reply brief ordinarily comes too late for our consideration.") (internal quotation marks and citations omitted). In any event, record evidence appears to contradict petitioners' contentions. According to the declaration submitted by the government, Guantanamo medical staff will enterally feed a detainee "only . . . when it becomes medically necessary to preserve a detainee's life and health." Decl. of Commander [Redacted], M.D., 4. Of course, petitioners may seek to press this claim—as well as other claims related to particular aspects of the force-feeding protocol employed at Guantanamo—before the district court. For these same reasons, we also now deny petitioners' request for supplemental briefing regarding recent revisions to the government's protocol and dismiss their motion for disclosure of the details of that revised protocol without prejudice to its reassertion in the district court.

This brings us, then, to petitioners' second claim—that the force-feeding protocol violates their rights under the Religious Freedom Restoration Act (RFRA) because it prevents them from engaging in communal prayers during Ramadan. Before discussing the merits of this claim, we must first address the government's contention that it has become moot.

Although it is true, as the government points out, that Ramadan is now over, and thus petitioners cannot claim that the force-feeding protocol currently infringes on their observation of that month, the RFRA claim clearly falls within the "capable of repetition yet evading review" exception to the mootness doctrine. *See Clarke v. United*

*States*, 915 F.2d 699, 704 (D.C. Cir. 1990). Petitioner Dhiab has undoubtedly satisfied the first of the two required elements of this exception: because Ramadan lasts only a month, the challenged aspects of force-feeding that interfere with communal prayer during this month "[are] in [their] duration too short to be fully litigated prior to [their] cessation or expiration." *Id.* (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)). He has also satisfied the second requirement: there is a "reasonable expectation that [he will] be subjected to the same action again." *Id.* (quoting *Murphy*, 455 U.S. at 482). More than ten months after officials first designated him as a hunger-striker, Dhiab continues to refuse to eat. Moreover, Dhiab asserts that he plans to continue his strike in order to receive a "resolution to [his] case," that he is "not afraid" of his captors, and that "[i]t would be an honor to die." Crider Decl. 15, 17. These facts and statements sufficiently establish the likelihood that Dhiab will continue to be affected by the government's force-feeding protocol this year at Ramadan if it remains in place and he continues to be detained. Although the government could release Dhiab before then, or modify the protocol so as to avoid infringing on Dhiab's observation of Ramadan, neither of these outcomes is sufficiently likely to defeat what is otherwise a "reasonable expectation" that Dhiab will again be subjected to this treatment. *See Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009). And because Dhiab's claim is not moot, we have no need to decide whether those of the other petitioners might be. *See Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998) ("If one party has standing in an action, a court need not reach the issue of standing of other parties when it makes no difference to the merits of the case." (internal quotation marks omitted)).

We agree with the government, however, that the law of this circuit clearly forecloses petitioners' RFRA claim. In

*Rasul v. Myers*, 563 F.3d 527 (D.C. Cir. 2009), we expressly held that RFRA's protections do not extend to Guantanamo detainees, who, as nonresident aliens, do not qualify as protected "person[s]" within the meaning of that statute. *Id.* at 532. Congress, we reasoned, intended the term "person" to "be read consistently with similar language in constitutional provisions, as interpreted by the Supreme Court at the time Congress enacted RFRA" in 1993, and held that decisions such as *Johnson v. Eisentrager*, 339 U.S. 763 (1950) and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) would have led Congress to presume that the term did not encompass nonresident aliens. *Id.* at 533; *see also Rasul v. Myers*, 512 F.3d 644, 670–72 (D.C. Cir. 2008), *vacated by Rasul v. Myers*, 555 U.S. 1083 (2008).

Petitioners argue that *Citizens United v. FEC*, 558 U.S. 310 (2010), in which the Supreme Court expanded the First Amendment's protections of corporate political speech while also declining to address whether the government might have a compelling interest in limiting the similar speech of "foreign individuals or associations," *id.* at 362, has so weakened *Rasul*'s premise that we are no longer bound by its holding. But the Supreme Court's *current* interpretation of the First Amendment's free speech guarantee in no way undermines our assessment of Congress's likely understanding of existing constitutional law in 1993. Moreover, this court recently rejected a very similar argument in holding that RFRA's protections of the free exercise of religion do not extend to corporations. *Gilardi v. U.S. Department of Health and Human Services*, 733 F.3d 1208, 1214–15 (D.C. Cir. 2013). If nothing in *Citizens United* compels the conclusion that corporations are "person[s]" within the meaning of RFRA, that decision certainly does not compel us to revisit our conclusion that nonresident aliens are likewise excluded from RFRA's protections.

## B.

We need discuss only briefly the three remaining factors that govern the decision to grant a preliminary injunction: the likelihood that petitioners will suffer irreparable harm, the balance of the equities, and the public interest. *See Winter*, 555 U.S. at 20. In this circuit, it remains an open question whether the "likelihood of success" factor is "an independent, free-standing requirement," or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a "serious legal question" on the merits. *Sherley*, 644 F.3d at 393, 398. But we have no need to resolve this question here because the remaining factors do not, in any event, weigh in petitioners' favor. The primary "purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo." *Doeskin Products, Inc. v. United Paper Co.*, 195 F.2d 356, 358 (7th Cir. 1952); *see generally National Ass'n of Farmworkers Organizations v. Marshall*, 628 F.2d 604, 613–16 (D.C. Cir. 1980). In this case, even if petitioners might eventually prevail in their challenge to the government's force-feeding protocol, we see especially good reasons for preserving the status quo by denying petitioners' request. Were we to now conclude that a preliminary injunction should issue, and then the district court, this court, or the Supreme Court later determined that the petitioners' claims lacked merit, the petitioners could very well die before the government would ever receive the benefit of that decision. But were we to uphold the district court's denial of a preliminary injunction, and it was later determined that force-feeding as practiced at Guantanamo violates petitioners' rights, petitioners would suffer by being compelled to endure force-feeding or the threat of force-feeding in the interim, but they would ultimately be able to engage in an uninterrupted hunger strike as they wish. Given that the risk of error is

greater if a preliminary injunction is granted than if it is denied, we conclude, as did Judge Collyer, that the balance of equities and public interest support denying petitioners' request for interim relief.

## IV.

For the forgoing reasons, we affirm the district courts' denials of petitioners' applications for a preliminary injunction.

*So ordered.*

WILLIAMS, *Senior Circuit Judge*, dissenting: As the majority aptly explains, Maj. Op. at 6-11, the current state of Congress's back-and-forth with the courts over federal jurisdiction to consider claims by detainees at Guantanamo is this: claims that sound in habeas may be heard; all others may not. Today we decide which category embraces a challenge to a detainee's conditions of confinement. The majority concludes that such a claim sounds in habeas. I disagree. Although we once toyed with that idea (in dictum), we have never *held* habeas to reach a prisoner's conditions of confinement. And the majority provides no persuasive reason why we should reach that decision for the first time today. Congress has repeatedly and forcefully sought to withdraw the federal courts' jurisdiction over Guantanamo detainees. I would not enlarge the writ to encompass a novel theory in the face of such clear congressional intent.

* * *

The Supreme Court's most recent position on whether habeas encompasses prisoner challenges to their conditions of confinement has been one of agnosticism. Maj. Op. at 12-14 (citing *Preiser v. Rodriguez*, 411 U.S. 475 (1973), and *Bell v. Wolfish*, 441 U.S. 520 (1979)). The majority thus turns to decisions of this court, finding *Hudson v. Hardy*, 424 F.2d 854 (D.C. Cir. 1970), a precedent for the view that habeas covers such claims. Maj. Op. at 14-17. I find no such holding in *Hudson*.

*Hudson*'s background is simple. In an action styled a petition for a declaratory judgment, Hudson sought an order granting him certain privileges, release from a control cell, or outright release from custody. In our initial pass at the case, we held that the district court had been too hasty in granting summary judgment against Hudson, applying the standards for summary judgment with a "strict literalness" that was

inappropriate for a pro se prisoner. *Hudson v. Hardy*, 412 F.2d 1091, 1094-95 (D.C. Cir. 1968). We then granted the defendants' request for rehearing, in order to consider not only the merits but also defendants' claim that Hudson's transfer to Leavenworth had mooted the case. *Hudson*, 424 F.2d at 855-56. We adhered to our initial decision that the district court had been too hasty, but added an instruction to that court to canvas the facts relevant to mootness. In articulating the district court's mission on remand, we discussed a number of circumstances that might avert dismissal for mootness.

There are many reasons to reject the view that our theorizing in *Hudson* established a precedent extending habeas to conditions of confinement—so many that the reader deserves a short road map. First, we left completely unresolved the question whether the federal courts had jurisdiction at all; that being so, we were in no position to issue a final merits ruling. Second, we noted that 42 U.S.C. § 1983 was available to the plaintiff; we thus had no need to examine whether § 1983 or habeas best fitted plaintiff's claims, to the extent that they might have related to conditions of confinement. Third, of the various circumstances that we suggested might save the case from mootness, it is doubtful whether any can properly be characterized as involving "conditions of confinement" (a phrase we never used in *Hudson*).

First we noted that *if* plaintiff sought money damages, the case was not moot. 424 F.2d at 855. But because we were uncertain whether he sought damages, we went on to discuss the situation if he did not, saying that even in that case "it is by no means certain that the case has become moot." *Id*. In remanding to the district court, we identified a handful of

reasons Hudson might face ongoing injury; not one of those reasons depended on our observation about habeas, *id.* at 855 n.3, which was therefore dictum rather than holding.

Indeed, nowhere in the opinion did we purport to actually *find jurisdiction*. Although we didn't explicitly invoke the principle and practice that in determining jurisdiction a court assumes the validity of plaintiff's merits claims, see, e.g., *Coleman v. Miller*, 307 U.S. 433, 446 (1939); *Doe v. Harris*, 696 F.2d 109, 113-14 n.7 (D.C. Cir. 1982); *Smith v. Bd. of Comm'rs of D.C.*, 380 F.2d 632, 634 (D.C. Cir. 1967); see also *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973) (applying the principle without stating it), we certainly never abjured the principle, and our discussion was fully consistent with the practice.

And with good reason. For us to have applied substantive law before finding jurisdiction would have flouted the rule that on any appeal "the first and fundamental question is that of jurisdiction." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1869)). "Every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review." *Id.* at 95 (internal quotation marks omitted). The rule long antedated *Hudson*. "This Court's insistence that proper jurisdiction appear begins at least as early as 1804." *Id.* And the principle applies as much to mootness as to any other issue of subject-matter jurisdiction. *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726-27 (2013). Of course jurisdiction may depend on the merits claims; the longstanding solution is to assume the merits of plaintiff's position. We have no basis for now declaring that our

decision in *Hudson* deviated from these principles: jurisdiction first, and for that analysis, merits merely assumed.

Recognizing that an absence of jurisdiction would preclude *Hudson* from having precedential effect, the majority seeks to characterize the merits of Hudson's claim as itself a jurisdictional question, so that the *Hudson* court (permissibly) resolved it before resolving mootness. Maj. Op. at 16. Some elements of 28 U.S.C. § 2241 doubtless are jurisdictional. For example, issuance of the writ requires (absent waiver) personal jurisdiction over the custodian, *Rumsfeld v. Padilla*, 542 U.S. 426, 434 & n.7, 442 (2004); *id*. at 451-52 (Kennedy, J., concurring), and subject-matter jurisdiction depends on the petitioner's being in custody, *Maleng v. Cook*, 490 U.S. 488, 490, 493-94 (1989). But that does not mean that a claim's cognizability under habeas is also jurisdictional. While the Court in *Rasul v. Bush*, 542 U.S. 466 (2004) (decided the same day as *Padilla*), rejected the government's defense that federal courts lacked habeas jurisdiction beyond the United States' sovereign territory, it nowhere suggested that the merits of whether a claim is cognizable in habeas is itself jurisdictional. The majority's attempt to analogize habeas to federal question jurisdiction similarly confuses merits and jurisdiction. Where a claim "will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another," the issue is one of merits, not jurisdiction. *Steel Co*., 523 U.S. at 89 (quoting *Bell v. Hood*, 327 U.S. 678, 685 (1946)).

The majority reads the discussion of potential alternative grounds for jurisdiction in *Bell v. Wolfish* to stand for the proposition that the scope of habeas is normally a jurisdictional issue. Maj. Op. at 16 (citing 441 U.S. at 527 n.6). All I can extract with confidence from that footnote is

that in meeting its obligation to be sure of jurisdiction, the Court found 28 U.S.C. § 1331 sufficient and thus saw no need even to consider whether habeas's scope was a merits or a jurisdictional question. Especially given the courts' loose usage of "jurisdiction" before the last decade, see *Kontrick v. Ryan*, 540 U.S. 443 (2004), I am skeptical that offhand references to jurisdiction in a footnote prove that habeas's exact scope is a jurisdictional question. Nor does the majority's reference to *Kiyemba v. Obama*, 561 F.3d 509 (2009), shed light on the correct reading of *Hudson*; our holding there merely reflects Congress's enactment of § 2241(e)(2) and the Supreme Court's holding in *Boumediene v. Bush*, 553 U.S. 723 (2008), which together made the scope of habeas a jurisdictional issue for Guantanamo detainees by divesting the courts of jurisdiction to grant any non-habeas relief. It tells us nothing about whether a court's reading of the habeas statute in effect in the *Hudson* era had any jurisdictional character.

Given that the *Hudson* court never suggested that its ruminations on Hudson's possible causes of action touched on jurisdiction, and that the habeas statute in effect at the time used no jurisdictional language, see 28 U.S.C. § 2241 (1970), there seems no reason to suppose that *Hudson*'s decision to remand for a mootness determination constituted a resolution of any jurisdictional questions that habeas may entail.

But even if we put the jurisdictional question aside, Hudson's claim that officials of the District of Columbia had subjected him to "'unjust and cruel' disciplinary action," 412 F.2d at 1092, was, as to state officials and those of the District of Columbia, the sort of claim that could be brought under 42 U.S.C. § 1983. E.g., *Edwards v. Sard*, 250 F. Supp. 977, 978 (D.D.C. 1966). Twice in the opinion we explicitly recognized

the availability of § 1983. 424 F.2d at 855 & n.3. Once again, I see precisely nothing that turned on classifying Hudson's claims—insofar as they may have addressed conditions of confinement—as sounding in habeas.

Finally, regardless of the unresolved status of our jurisdiction and the availability of § 1983, *Hudson* is quite unclear whether it addresses conditions of confinement at all. In order to "sketch" the principles we thought should guide the mootness inquiry, we reviewed a number of possible claims that might have survived cessation of the allegedly unlawful conduct and the plaintiff's removal from the defendants' reach. *Id*. at 856. Those claims stemmed from the fact that a prisoner's "disciplinary record may follow him throughout the prison system." *Id*. It therefore might "affect his eligibility for parole." *Id.* Such eligibility of course presents a classic subject of habeas, a claim that would be "squarely within th[e] traditional scope of habeas corpus," *Preiser*, 411 U.S. at 487. See *Peyton v. Rowe*, 391 U.S. 54 (1968) (cited by *Hudson*, 424 F.2d at 856). We also mused that Hudson's prior discipline might compound his future punishment, 424 F.2d at 856. But as an example of future punishment we pointed to Hudson's transfer to the prison at Leavenworth. *Id*. at 856 & n.8. As we had decided a few years earlier that habeas is available to challenge "not only the fact of confinement but also the *place* of confinement," *Lake v. Cameron*, 364 F.2d 657, 659 (D.C. Cir. 1966) (emphasis added), this may well have been the root of our speculation that relief was still possible. We concluded that "[i]f [Hudson] desires that the case be treated as a petition for habeas corpus, the court should inform itself of the extent to which appellant is, or is likely to be, still subject to disabilities because of the unlawful acts alleged." 424 F.2d at 856. Assuming we reached a holding on habeas, it was that it

encompassed the "disabilities" we specified—examples fully in line with historical habeas practice—not the loose talk about "form of confinement" that we consigned to a footnote, *id*. at 855 n.3.

In short, in framing the district court's future jurisdictional inquiry, we tossed up a salad of possible merits claims. This was a perfectly proper way to guide the district court's exploration of mootness. But that does not mean that any of these speculations constituted a holding. Even assuming the court meant habeas to encompass conditions of confinement, we had neither jurisdiction nor occasion to settle any substantive legal issue, and in the two short pages of F.2d that *Hudson* occupies (other than caption, headnotes, etc.), I do not see that we did so.

And I also agree with the majority's acknowledgement that its other cases fail to do so. Maj. Op. at 17. Two of the cases, *Miller v. Overholser*, 206 F.2d 415 (D.C. Cir. 1953), and *Creek v. Stone,* 379 F.2d 106 (D.C. Cir. 1967), see Maj. Op. at 18, address conditions of confinement that "vitiate the justification for confinement." 379 F.2d at 109; 206 F.2d at 419 (claim renders confinement "not authorized by the statute"). If the basis for confinement is eliminated altogether, outright release would be the remedy, and the petition would fall within the mine run of habeas challenges. *Miller*, for example, involved a civil commitment statute intended to rehabilitate sex offenders. The court held that Miller's confinement with the criminally insane and without treatment was therefore a confinement "not authorized by the statute," rendering his confinement illegal. 206 F.2d at 419. But the decision was clear that it would apply only in cases that challenge the "legal validity of confinement," *id.*, which petitioners do not do. Cf. Maj. Op. at 30.

*Creek* too depends on the proposition that the challenged conditions vitiate the justification for confinement. 379 F.2d at 110. And perhaps more importantly, the court in *Creek* lacked jurisdiction because the petitioners' transfer out of the conditions complained of rendered the case moot. *Id.* By now it should be clear that the absence of jurisdiction is a common theme among the majority's cases. *United States v. Wilson*, 471 F.2d 1072 (D.C. Cir. 1972), is no different. The majority relies on *Wilson* for the proposition that petitioner "unquestionably" may challenge his conditions of confinement in habeas. Maj. Op. at 17-18 (quoting *Wilson*, 471 F.2d at 1081). Yet right before that observation, the court held that it lacked jurisdiction over Wilson's petition, concluding that "no remedy is available in this Court" because the place of confinement was not within its territorial jurisdiction. 471 F.2d at 1081 (citing *Ahrens v. Clark*, 335 U.S. 188 (1948)). Here again *Steel Co.*'s teachings are critical. "For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Steel Co.*, 523 U.S. at 101-02. I see no basis for relying on ultra vires statements to determine the appropriate bounds of habeas.

More recent cases from this circuit suggest that the availability of habeas to challenge conditions of confinement is a murkier question than the majority's cases suggest. In *Blair-Bey v. Quick*, for example, we entertained the possibility that habeas itself "*might* be available" for challenges to prison conditions. 151 F.3d 1036, 1039-42 (D.C. Cir. 1998) (Wald, Williams & Tatel, JJ.) (emphasis added). We solved the problem by saying, "Such claims, *if* they are permissibly brought in habeas corpus, would have to be subject to the PLRA's filing fee rules." *Id.* at 1042 (emphasis added). It

would be odd to treat 1998's mere possibility as a rule clearly established by the time of the MCA, less than ten years later. Yet that is exactly the conclusion that the majority reaches.

Because not one of these cases *holds* that habeas encompasses claims based on the conditions of a detainee's confinement, I conclude that no precedent of ours controls the outcome of this case.

* * *

The majority soft-pedals the distinction between challenges to the fact or place of confinement and ones to conditions of confinement by observing that one remedy unquestionably available under habeas (in this case, the prisoner's release) "may" redress both claims, so that the distinction between the claims is "largely illusory." Maj. Op. at 19-20. After all, the majority explains, a court can always order release if the petitioner's custodian does not remedy the defect in the place of confinement. But to suggest that courts should feel complacent in expanding an ancient writ—confined for centuries to attacks on the fact or place of confinement—to reach *any* unlawful aspect of the confinement merely because the illegality could, *in extremis*, be cured by an order of release, seems in effect to discard history as a guide.

In any event, a focus on remote, unsatisfactory and implausible remedies of release is a far cry from how an inquiry into the availability of habeas normally proceeds. As the majority observes, Maj. Op. at 9, in determining the scope of our jurisdiction in *Kiyemba* we first needed to assess the effect of the Supreme Court's decision in *Boumediene*. Notwithstanding the fact that an order of release would have

sufficed to grant the *Kiyemba* petitioners' requested relief, we reviewed the congressional authorization to consider their claims as well as the traditional boundaries of habeas. *Kiyemba*, 561 F.3d at 512-13.  In doing so, we followed the path laid out by the Supreme Court, which determines its habeas authority not by reference to the potential remedy, but instead by reviewing historical practice under statutory and common law.  *INS v. St. Cyr*, 533 U.S. 289, 305-08 (2001); see *Boumediene*, 553 U.S. at 739-52; *Rasul*, 542 U.S. at 473-84.  Thus the majority's focus on remedies seems completely orthogonal to the method by which the Supreme Court determines the limits of habeas; it should not influence our decision here.

This case itself illustrates the skewed fit between a substantive attack on conditions of confinement and a remedy of release.  The petitioners understandably never seek "the writ's more traditional remedy of outright release," Maj. Op. at 19.  See J.A. 1, 3 (requesting injunction prohibiting force-feeding); J.A. 158 (requesting injunction prohibiting alleged deprivation of right to communal prayer); Aamer Br. 5 (requesting both forms of injunctive relief).  And the majority, rightly acknowledging the legality of the petitioners' detention, Maj. Op. at 30, focuses only on whether to enjoin the practice of force-feeding.  The theoretical effectiveness of an implausible remedy seems a thin basis for shoehorning litigation over conditions of confinement into habeas.

\* \* \*

Under the majority's view, it need not consider petitioners' alternative theories supporting jurisdiction, but I must.  They are no more convincing.  Relying on a pair of cases from the Seventh Circuit, petitioners first contend that

because the force-feeding protocol requires transfer from "communal living quarters" to "single cell operations," it constitutes a quantum change in his level of custody, rendering his petition cognizable in habeas. Aamer Br. 24-25. They quote the Seventh Circuit as follows: "If the prisoner is seeking what can fairly be described as a quantum change in the level of custody—whether outright freedom, or freedom subject to the limited reporting and financial constraints of bond or parole or probation, or the run of the prison in contrast to the approximation to solitary confinement that is disciplinary segregation—then habeas corpus is his remedy." *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991). But they omit the critical next sentence: "if [the petitioner] is seeking a different program or location or environment, then he is challenging the conditions rather than the fact of his confinement and his remedy is under civil rights law, even if, as will usually be the case, the program or location or environment that he is challenging is more restrictive than the alternative that he seeks." *Id.* at 381. Putting aside the fact that this court has not recognized the "quantum change" theory, the petition here falls squarely within the claims described by the second sentence; he seeks only an alteration to his program and thus his claims sound in civil rights law, even under *Graham*. Accordingly, § 2241(e)(2) bars Aamer's claims. *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 319 (D.C. Cir. 2012).

Aamer also asserts that we have jurisdiction because force-feeding constitutes a "severe restraint[] on individual liberty." Aamer Br. at 26-27 (citing *Hensley v. Mun. Court, San Jose Milpitas Judicial Dist., Santa Clara Cnty.*, 411 U.S. 345, 351 (1973)). While it is true that habeas's custody requirement can be met by restraints falling short of incarceration (in *Hensley*, the Court allowed a petition by a

defendant released on his own recognizance pending the start of his challenged sentence), it doesn't follow that any liberty interest enjoying protection under the Fifth Amendment, e.g., the interest in resisting involuntary subjection to pharmaceuticals, *Sell v. United States*, 539 U.S. 166, 177-83 (2003), is a liberty protected by habeas. Petitioners' characterization of the affected values as liberty interests is therefore not enough to create habeas jurisdiction. See *Janko v. Gates*, No. 12-5017, slip op. at 17-19 (D.C. Cir. Jan. 17, 2014).

* * *

I close with a brief consideration of where we are and how we got here. In § 7 of the MCA Congress sought to all but extinguish federal courts' jurisdiction to hear claims by detainees at Guantanamo. Subsection 2241(e)(1) purported to remove all habeas corpus jurisdiction over such aliens; subsection (e)(2) eliminated all other jurisdiction, except for the judicial process that Congress had previously established for review of executive branch decisions on the lawfulness of detention. See Maj. Op. at 7-8. By the two subsections taken together, then, Congress sought (with the exception noted) to exclude Guantanamo detainees from United States courts.

In *Boumediene* the Supreme Court held that subsection (e)(1) violated the Suspension Clause, 553 U.S. at 733, 771, 792, but it did not address whether the MCA was valid insofar as it ousted courts from habeas jurisdiction not protected by that clause. We answered this question in *Kiyemba*, 561 F.3d at 512 n.2, interpreting *Boumediene* to have struck down the MCA's attempt to withdraw habeas jurisdiction over detainees at Guantanamo in its entirety, regardless of whether the suspension clause required that invalidation. That decision of

course binds this panel, though it self-evidently opens the courts to actions by detainees under circumstances where Congress intended that they be shut (this case being one example), and was concededly not in any way compelled by *Boumediene*. See *id*. at 512; *id*. at 523 (Griffith, J., concurring in the judgment in part and dissenting in part). Yet although *Kiyemba* restored habeas to its "status quo ante" the MCA, *id*. at 512 n.2, nothing in that decision requires that we further expand the writ to encompass habeas claims that did not predate the MCA.

The majority does precisely that. To determine just how much the courts will open themselves to habeas independently of the Suspension Clause's constitutional pressure, it relies on our reflections in *Hudson*—a case in which we had not found any federal court jurisdiction, where any discussion of the fine points of habeas versus § 1983 was unnecessary, and where it is unclear whether our speculation about plaintiff's claims even addressed conditions of confinement. Because neither *Hudson* nor any other case of ours establishes the availability of a conditions of confinement claim under habeas, *Kiyemba*'s restoration of the status quo ante does not compel us to recognize such a claim. And Congress has made quite clear that we shouldn't. Subsection (e)(1) may be a dead letter, but that does not compel us to ignore Congress's intent behind subsection (e) as a whole, which unmistakably sought to prevent the federal courts from entertaining claims based on detainees' conditions of confinement. Cf. *Janko v. Gates*, No. 12-5017, slip op. at 10 & n.4 (looking to (e)(1) to interpret (e)(2)). Such evident congressional intent would seem to counsel a cautious rather than a bravura reading of *Hudson*.

Respectfully dissenting, I would affirm the district courts' dismissal of the petitions for want of jurisdiction.