UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
SHAKER AAMER (ISN 239),         )
)
           Petitioner,       )
)
     v.               )       Civil Action No. 04-2215 (RMC)
)
BARACK H. OBAMA,[1] *et al.*,    )
)
          Respondents.     )
_____)

## OPINION

In the six years since the Supreme Court restored the federal courts' statutory habeas corpus jurisdiction over detainees at the U.S. Naval Base in Guantanamo Bay, Cuba, the Judiciary has worked to map the contours of the Great Writ in these exceptional circumstances. In 2013, the D.C. Circuit decided that a military regulation providing for repatriation of detained medical personnel is domestic law applicable to Guantanamo detainees *and* that the regulation imports certain aspects of the Geneva Conventions into these unique habeas proceedings. Thereafter, the D.C. Circuit held that the Writ is available to challenge both the fact of detention *and* conditions of detainee confinement.

Seizing on these recent developments, Petitioner Shaker Aamer, a detainee at Guantanamo, seeks to break new habeas ground. In addition to providing for repatriation of detained medical personnel, the military regulation that the Circuit has adjudged to apply to Guantanamo detainees contemplates releasing particular military prisoners who have fallen seriously ill. Petitioner argues that the regulation should apply to him. He claims to suffer from

_____

[1] Pursuant to Federal Rule of Civil Procedure 25(d), President Barack H. Obama is substituted for former President George W. Bush.

1

various physical and mental ailments from which he cannot, and will not, recover while detained at Guantanamo, and contends that he qualifies as the type of prisoner under the military regulation subject to repatriation. Accordingly, he demands immediate release.

Petitioner's argument is flawed. The Circuit's recent expansions of habeas for detainees have turned on whether the relief sought was a constitutional or statutory right to which the detainee could claim an entitlement. Here, even if the military regulation applies to Petitioner and even if Petitioner is as gravely ill as he claims, Petitioner has made no attempt to establish his entitlement to release under the terms of the regulation. Because he cannot explicitly establish that the military regulation requires his release even under his view of the law and facts, Petitioner cannot invoke that regulation, or, consequently, the Geneva Conventions, as grounds for habeas relief. The Court, therefore, will deny Petitioner's motion.

## I. FACTS

The basic facts are not in dispute. Petitioner is a Saudi national and legal resident of the United Kingdom. Mot. for J. on Pet. for Writ (Mot. for J.) [Dkt. 255] at 2. Since 2002, the United States has detained him at Guantanamo, *id.*, pursuant to the Authorization for the Use of Military Force (AUMF), Pub. L. No. 107-40, 115 Stat. 224 (2001). Respondents contend that Petitioner is associated with the Taliban and al-Qaeda, and underscore that a Combatant Status Review Tribunal (CSRT) has deemed Petitioner to be an "enemy combatant." *See* Office of the Sec'y of Def. & Joint Staff, Unclassified Combatant Status Review Board Summ. of Evidence, 266-67 (Nov. 19, 2004), *available at* http://www.dod.gov/pubs/foi/operation_and_plans/ Detainee/csrt_arb/000201-000299.pdf; *see also* May 14, 2012 Classified Am. Factual Return [Dkt. 203].

Petitioner filed a petition for writ of habeas corpus in December 2004. *See* Pet. for Writ [Dkt. 1]. Four years later, Respondents informed the Court that the Department of Defense had cleared Petitioner for release and requested a stay while "the necessary and appropriate diplomatic arrangements to relinquish custody" were made. Consent Mot. to Stay [Dkt. 128] at 1. The Court granted the requested stay. *See* Dec. 19, 2008 Minute Order. Petitioner, however, was not released. Consequently, several years later, the Court granted a joint motion to lift the stay and directed the parties to proceed with discovery, *see* Dec. 7, 2011 Order [Dkt. 199], which currently is ongoing, *see* Joint Status Report [Dkt. 256] at 2.

In 2013, Petitioner hired an independent medical expert, Dr. Emily A. Keram, to conduct a physical and mental examination of him at Guantanamo over the course of five days. *See* Mot. for J., Ex. B (Keram Report) [Dkt. 255-2] at 1. Board certified in psychiatry and neurology with a sub-specialization board certification in forensic psychiatry, *id.*, Dr. Keram has rendered several medical opinions on Petitioner, all "to a reasonable degree of medical *probability*," *id.* at 12 (emphasis added). Although Dr. Keram has remarked on Petitioner's physical state, noting that he suffers from swelling of his lower extremities, headaches, asthma, and chronic urinary retention, *id.* at 18-19, her report expresses more concern about Petitioner's psychiatric condition. Dr. Keram states that Petitioner suffers from a host of mental ailments, including depression, dysphoria, anxiety, paranoid ideation, and most importantly, post-traumatic stress disorder (PTSD) of unknown origin. *Id.* at 12-14. She opines that Petitioner's psychiatric condition is grave, *id.* at 15, will require years of treatment, *id.* at 15-16, and cannot improve while confined at Guantanamo because the "conditions of detention are in themselves a constant source of stress and trauma," *id.* at 17, and because of a perceived breakdown in the doctor-patient relationship there, *id.* at 17-18.

Dr. Keram advocates repatriating Petitioner, but only to the United Kingdom. She contends that repatriating Petitioner to his native country of Saudi Arabia will "re-traumatize" him. *Id.* at 17. Dr. Keram claims that Saudi Arabia will confine him, place him in a rehabilitation program for some period of time, and continue to separate him from his family. *Id.* On the other hand, physicians in the United Kingdom, according to Dr. Keram, have the resources and cultural understanding that Petitioner needs to make a complete recovery. *Id.*

Based on Dr. Keram's examination, Petitioner filed a Motion for Judgment on the Petition for Writ of Habeas Corpus. In his motion, Petitioner does not challenge the factual basis for his detention (*i.e.*, his alleged ties to the Taliban and al-Qaeda). His sole contention here is that Army Regulation 190-8, and those provisions of the Third Geneva Convention that it incorporates, require his immediate release to the United Kingdom in light of Dr. Keram's diagnoses.

Respondents challenge Petitioner's legal arguments and medical contentions. *See* Opp'n [Dkt. 260]. They claim that Petitioner misperceives the law. Moreover, Respondents claim that even if Army Regulation 190-8 and the Third Geneva Convention apply to Petitioner, he has not established that his health is in such a poor state that he must be repatriated. Respondents submit a declaration from Navy Commander Stephen D. Hoag, M.D., who currently serves as the Senior Medical Officer for the Joint Medical Group (JMG) of the Joint Task Force at Guantanamo (JTF-GTMO). Commander Hoag has served in this capacity since February 26, 2014. Opp'n, Ex. 1 (Hoag Decl.) [Dkt. 260-1] ¶ 1. Commander Hoag recounts Petitioner's physical ailments, *id.* ¶¶ 11-14 (detailing Petitioner's medical history, noting swelling of the feet and ankles, mild anemia due to hunger strikes, common allergies, dry skin, ear infections, chronic urological issues, and possible inflammatory arthritis), and states that

4

Petitioner has created many of these health problems by refusing nearly all diagnostic examinations and most treatment, *id.* ¶¶ 10, 12-14. With respect to Petitioner's mental health, Commander Hoag states that Petitioner has refused psychological support and observes that Petitioner's behavior, while sometimes disruptive, does not support any formal psychiatric diagnosis, including PTSD. *Id.* ¶¶ 19-21. Indeed, Commander Hoag suggests that Petitioner's refusal to accept mental health care from the medical staff at Guantanamo is not due to psychological distress but rather is a means for Petitioner to protest Guantanamo policies, gain a perceived legal advantage, or oppose alleged gaps in doctor-patient confidentiality. *Id.* ¶¶ 17-18, 21. Nonetheless, the Guantanamo medical staff continues to monitor Petitioner's physical and mental health status despite his continued refusals to receive treatment. *Id.* ¶ 22.

In Reply, Petitioner submits a second declaration from Dr. Keram. *See* Reply [Dkt. 263], Ex. A (Keram Decl.) [Dkt. 263-1]. Dr. Keram challenges Commander Hoag's conclusions. She notes that Commander Hoag is not a psychiatrist, has been at Guantanamo only a short period of time, and does not claim to have treated Petitioner directly. Keram Decl. ¶¶ 7-8. Dr. Keram also reiterates her conclusion that Petitioner suffers from debilitating PTSD. Reviewing the personality traits and behaviors described in Commander Hoag's declaration, Dr. Keram contends that they are consistent with a diagnosis of "moderate to severe PTSD," *id.* ¶ 23, and again impugns the ability of the medical staff at Guantanamo to treat Petitioner's symptoms properly, *id.* ¶¶ 9-15.

Petitioner's Motion is now ripe. Although the parties dispute Petitioner's health status, the motion can be resolved without deciding that issue. Even if the Court assumes Petitioner is as ill as he claims to be, Petitioner has not established his entitlement to habeas relief under Army Regulation 190-8 and, therefore, cannot invoke the provisions of the Third

5

Geneva Convention that it incorporates.  Accordingly, this dispute presents a question of law that may be resolved on the briefs before the Court.

## II. LEGAL FRAMEWORK

In exercising its habeas jurisdiction over detainees at Guantanamo, *see Boumediene v. Bush*, 553 U.S. 723, 777 (2008); *Rasul v. Bush*, 542 U.S. 466, 484 (2004); *Kiyemba v. Obama*, 561 F.3d 509, 512 n.2 (D.C. Cir. 2009), the Judicial Branch "serv[es] as an important . . . check on the Executive's discretion in the realm of detentions," *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion).  Emblematic is this Circuit's recent detainee jurisprudence.  While the D.C. Circuit "has repeatedly held that under the [AUMF], individuals may be detained at Guantanamo so long as they are determined to have been part of [a]l[-]Qaeda, the Taliban, or associated forces, and so long as hostilities are ongoing," *Aamer v. Obama*, 742 F.3d 1023, 1041 (D.C. Cir. 2014) (internal citation omitted) (citing *Al-Bihani v. Obama*, 590 F.3d 866, 873-74 (D.C. Cir. 2010)),[2] it has not hesitated to expand the scope of claims subject to habeas review, *see id.* at 1030 (finding that federal courts have subject matter jurisdiction over challenges to conditions of confinement even though such claims "undoubtedly fall outside the historical core of the writ").  Similarly, the Circuit has determined that the scope of the Executive's detention authority under the AUMF is not *sui generis* but is constrained by domestic caselaw and statutes.  *See id.* at 1031-1038 (reviewing habeas challenges by American prisoners to their conditions of confinement); *Al Warafi v. Obama* (*Al Warafi II*), 716 F.3d 627, 629 (D.C. Cir. 2013) (finding Army Regulation 190-8 applicable to detainees), *cert. denied*, 134

---

[2] *Aamer* arose out of force-feeding protocol that the government instituted in response to hunger strikes by detainees at Guantanamo.  742 F.3d at 1026.  That litigation, which was brought by Petitioner and two other detainees, presented the following issue: whether Guantanamo detainees could utilize habeas corpus to challenge the government's force-feeding practices.  *Id.*  As discussed *infra*, the D.C. Circuit answered this question in the affirmative.

S. Ct. 2134 (2014) (mem.); *Al-Bihani*, 590 F.3d at 871-72 (resolving detainee's challenge to legitimacy of his detention by "look[ing] to[] the text of relevant statutes and controlling domestic caselaw").

There is no dispute that this Court has subject matter jurisdiction over Petitioner's Motion or that the laws of war are informative when interpreting the AUMF. *See* Opp'n at 13 n.8; *see also Hamdi*, 542 U.S. at 521. The question before the Court is whether Army Regulation 190-8, and by extension the Third Geneva Convention,[3] applies to Petitioner, such that his deteriorating physical and mental health requires the United States to repatriate him immediately. Accordingly, a brief overview of the relevant provisions of the Third Geneva Convention and Army Regulation 190-8 is necessary.

### A. The Third Geneva Convention

The Third Geneva Convention sets forth the parameters by which signatories agree to detain, treat, and, ultimately, release prisoners of war. Article 4 defines prisoners of war as follows:

> 1) Members of the armed forces of a [p]arty to the conflict as well as members of militias or volunteer corps forming part of such armed forces;
>
> 2) Members of other militias and members of other voluntary corps, including those of organized resistance movements,

---

[3] The Geneva Conventions are comprised of four multilateral treaties, *see* Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31 (First Geneva Convention); Geneva Convention for the Amelioration of the Condition of the Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85 (Second Geneva Convention); Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 (Third Geneva Convention); and Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (Fourth Geneva Convention), and three Additional Protocols. The United States has ratified all four Conventions and Additional Protocol III. *See* U.S. Dep't of State, Treaties in Force 465-66 (2013).

belonging to a [p]arty to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfil[l] the following conditions:

a) that of being commanded by a person responsible for his subordinates;

b) that of having a fixed distinctive sign recognizable at a distance;

c) that of carrying arms openly;

d) that of conducting their operations in accordance with the laws and customs of war.

3) Members of regular armed forces who profess allegiance to a government or an authority not recognized by the [d]etaining [p]ower.

4) Persons who accompany the armed forces without actually being members thereof . . . provided that they have received authorization from the armed forces which they accompany, who shall provide them for that purpose an identity card . . . .

5) Members of crews . . . who do not benefit by more favourable [sic] treatment under any other provisions of international law.

6) Inhabitants of a non-occupied territory who, on the approach of the enemy, spontaneously take up arms to resist the invading forces, without having had time to form themselves into regular armed units, provided they carry arms openly and respect the laws and customs of war.

Third Geneva Convention, *supra* note 3, art. 4. Where there is doubt as to whether a captured person qualifies as a prisoner of war, Article 5 requires the individual to be accorded such status until a "competent tribunal" determines otherwise. *Id.*, art. 5.

In general, the Third Geneva Convention ensures that persons designated as prisoners of war are handled humanely and receive appropriate treatment while detained. This overarching principle includes repatriation upon becoming seriously injured or ill. Article 110 of

the Third Geneva Convention obligates signatories to return a prisoner of war to his home country if his "mental or physical fitness seems to have been gravely diminished" and he: (1) is "[i]ncurably wounded and sick;" or (2) is so "[w]ounded and sick" that treatment is necessary and, "according to medical opinion," recovery within one year is unlikely.[4] *Id.*, art. 110. The Commentary to the Third Convention explains that generally "Mixed Medical Commissions," which are discussed in Articles 112 and 113, will evaluate the injuries and illnesses of prisoners and make repatriation recommendations. 3 Int'l Comm. of the Red Cross, Commentary: Geneva Convention Relative to the Treatment of Prisoners of War 515-17 (J. Pictet ed., 1960).[5] The Commentary also notes that Article 110 obligates detaining powers to return prisoners of war that fall into the aforementioned categories "before the end of hostilities." *Id.* at 515.

### B. Army Regulation 190-8

Despite its name, Army Regulation 190-8 applies across all U.S. military forces. *See* U.S. Dep'ts of the Army, Navy, Air Force, & Marine Corps, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, Army Regulation 190-8 (1997), *available at* http://www.apd.army.mil/pdffiles/r190_8.pdf. The Secretaries of the U.S. Army, Air Force, and Navy promulgated Army Regulation 190-8 in order to provide the men and women of the U.S. armed forces with guidance when capturing individuals during military operations. *Id.* § 1-1. In so doing, the Regulation "implements international law, both customary and codified" and identifies the Geneva Conventions as "[t]he principal treaties relevant to [the]

---

[4] Article 110 also requires repatriation where a prisoner of war's mental or physical fitness seems "gravely and *permanently* diminished" despite having *recovered* from an illness or injury. *Id.*, art. 110 (emphasis added).

[5] As the Supreme Court has explained, the "International Committee of the Red Cross is . . . the body that drafted and published the official commentary to the Conventions. Though not binding law, the commentary is . . . relevant in interpreting the Conventions' provisions." *Hamdan v. Rumsfeld*, 548 U.S. 557, 619 n.48 (2006).

[R]egulation." *Id.* It does not, however, alter the obligations of the United States under the Geneva Conventions. *Id.* ("In the event of conflicts or discrepancies between [the] [R]egulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence.").

The manner in which Army Regulation 190-8 may apply to any particular detainee turns on that person's designation. Where an individual commits a belligerent or hostile act in support of enemy armed forces and either claims prisoner of war status or doubt exists as to such status, a "competent tribunal" determines the individual's status under the Regulation. *Id.* § 1-6(b). There are four "[p]ossible" designations that may result: (1) "enemy prisoner of war," which is a term co-extensive with the definition of prisoner of war set forth in Articles 4 and 5 of the Third Geneva Convention; (2) "retained personnel," who are individuals who serve in a medical or religious capacity, attached to enemy armed forces, or are staff on voluntary aid societies; (3) "civilian internee," who is a person interned for operational security or in connection with an offense that s/he is believed to have committed against the detaining power; or (4) "innocent civilian," who is an individual who does not fall into any of these categories and should be immediately released. *See id.* § 1-6(e)(10), Glossary, Section II—Terms. Army Regulation 190-8 further provides that "[p]ersons in the custody of the U.S. Armed Forces who have not been classified as an [enemy prisoner of war] . . . , [retained personnel] . . . , or [civilian internee] . . . shall be treated as [enemy prisoners of war] until a legal status is ascertained by competent authority." *Id.* at Glossary, Section II—Terms. The Regulation refers to such unclassified individuals as "other detainees." *Id.*

Pertinent to the instant litigation are the Regulation's provisions addressing repatriation due to illness or injury. Section 3-12 states that detainees who are, or are being treated as, enemy prisoners of war or retained personnel are "eligible for direct repatriation" if

10

they are (1) "suffering from disabilities as a result of injury, loss of limb, paralysis, or other disabilities, when these disabilities are at least the loss of a hand or foot, or the equivalent," or (2) are ill or injured and their "conditions have become chronic to the extent that prognosis appears to preclude recovery in spite of treatment within 1 year from inception of disease or date of injury." *Id.* § 3-12(*l*). The Regulation provides that a Mixed Medical Commission, upon request, will determine whether a prisoner of war/detainee/retained personnel/other detainee suffers from an illness or injury that satisfies the criteria for repatriation. *Id.* § 3-12(c), (h). If the Mixed Medical Commission, which is comprised of a medical officer of the U.S. military and two physicians from a neutral country, *id.* § 3-12(a)(2), determines that the detained individual should be repatriated, then the United States must "carry out [that] decision[] . . . as soon as possible and within 3 months of the time after it receives due notice of the decision[]," *id.* § 3-12(f).

### III. ANALYSIS

In the abstract, Petitioner's challenge to his continued detention at Guantanamo is straightforward. The central thesis of his argument for release is that, under domestic law and international norms, the detention power of the Executive is at its ebb when a detainee is unable to return to the battlefield if released. Petitioner contends that he is so neutralized. He asserts that the physical and mental ailments from which he allegedly suffers are so chronic and debilitating that he has no prospect of rejoining the fight against the United States. Moreover, Petitioner contends that his basis for detention is further undercut by the inability of the medical staff at Guantanamo to provide him with the treatment he needs. *See* Mot. for J. at 15 ("[Petitioner] should be released immediately because his illness has become so chronic that

11

recovery, even with optimal circumstances and care, . . . is likely to take many years or the full course of his remaining natural life."). He asks this Court to order his immediate release.

The reality of the habeas landscape, however, presents significant obstacles to Petitioner's posited path to repatriation. Section 5 of the Military Commissions Act of 2006 (MCA) provides that:

> [n]o person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or a current or former officer, employee, member of the Armed Forces, or other agent of the United States is a party as a source of rights in any court of the United States or its States or territories.

Pub. L. No. 109-366, § 5(a), 120 Stat. 2600, 2631 (codified at 28 U.S.C. § 2241 note).[6] The Geneva Conventions, therefore, are not an independent source of law in detainee habeas proceedings. As the D.C. Circuit has determined, only domestic statutes and cases are relevant to detainee habeas claims. *See Al-Bihani*, 590 F.3d at 871-72 (explaining that international laws of war neither "act as extra-textual limiting principles for the President's war powers under the AUMF" nor serve as "a source of authority for U.S. courts").

This is not to say that international law has *no* force in detainee habeas proceedings in this Circuit. In *Al Warafi II*, a Guantanamo detainee argued that the United States was obligated to repatriate him under the First Geneva Convention and Army Regulation 190-8 because he qualified as a medic for the Taliban.[7] 716 F.3d at 628-29. The D.C. Circuit began its analysis by acknowledging that the MCA prohibits detainees from invoking the Geneva

---

[6] *Boumediene* invalidated Section 7 of the MCA because it "effect[ed] an unconstitutional suspension of the writ [of habeas corpus]." 553 U.S. at 792. *Boumediene* did not affect Section 5.

[7] Article 28 of the First Geneva Convention permits a belligerent to detain medical personnel only insofar as such individuals are needed to care for the health of prisoners of war in the belligerent's custody. First Geneva Convention, *supra* note 3, art. 28.

Conventions in habeas proceedings. Nonetheless, it found that the MCA was not an impediment to Al Warafi's habeas claims. *Id.* at 629. Deciding that Army Regulation 190-8 is "domestic U.S. law" that "expressly incorporates relevant aspects of the Geneva Convention's medical personnel protection," the Circuit concluded that it "may and must analyze" those portions of the Geneva Conventions that have been incorporated into Army Regulation 190-8 "to the extent that the [R]egulation explicitly establishe[d] [Al Warafi's] entitlement to release from custody." *Id.* Applying this principle, the Circuit explained that Al Warafi had to prove, as required by the First Geneva Convention, that the Taliban had given him the mandatory indicia of medical personnel: namely, a specialized armlet and identity card. *Id.* at 630. Because Al Warafi could not provide such proof, *id.* at 631 ("We hold that without the mandatory indicia of status, Al Warafi has not carried his burden of proving that he qualified 'as permanent medical personnel.'"), the Circuit found that he was "not entitled to the protection of the Convention," *id.* at 632.

Here, Petitioner contends that Army Regulation 190-8, incorporating aspects of the Third Geneva Convention, requires the military to repatriate seriously ill or wounded combatants in its custody and claims to qualify as such a combatant. The question presented, thus, is similar to that in *Al Warafi*; that is, whether Petitioner has "explicitly establishe[d]" his "entitlement to release from custody" under the Regulation. *Id.* at 629.

In contrast to *Al Warafi*, Petitioner does not claim to fit within one of the clearly-defined detention categories listed in Army Regulation 190-8. He does not claim to be a prisoner of war, a civilian internee, or retained personnel, such as a medic or chaplain. Instead, he asserts that he is an "other detainee." Petitioner's logic has some force: while a CSRT designated him an "enemy combatant," that classification is not recognized in Army Regulation 190-8.

13

Petitioner argues, therefore, that CSRTs are not "competent tribunals" within the meaning of the Regulation. Further, Petitioner challenges the applicability of a CSRT decision because the "mandate and procedures [of CSRTs] do not comport with domestic law and law of war norms." Reply at 8. For instance, he notes that CSRTs render binary determinations (*i.e.*, whether a detainee is or is not an enemy combatant), whereas tribunals convened pursuant to Army Regulation 190-8 evaluate detainees along a greater continuum (*i.e.*, whether a detainee is an "enemy prisoner of war," "retained personnel," "civilian internee," or "innocent civilian"). *Id.* at 8-9 ("With this limited mandate, CSRTs do not have the authority to declare a detainee a lawful combatant, which is the relevant authority contemplated for competent tribunals under Article 5 of the Third Geneva Convention."); *see also* Army Regulation 190-8, § 1-6(e)(10). Petitioner also asserts that CSRTs do not afford detainees a fair opportunity to present evidence, call and question witnesses, or challenge hearsay or compelled statements, and are not convened close in time and place to the location of the capture. Reply at 9 & n.9. Because "CSRT findings do not rise to the level of a legal status determination by a competent tribunal," *id.* at 10, Petitioner contends that his status has not been adjudicated for purposes of Army Regulation 190-8. As a result, he contends that Army Regulation 190-8 mandates that he is an "other detainee" who is entitled to the rights and protections that are accorded to "enemy prisoners of war," including repatriation due to serious illness. *Id.*

Not surprisingly, Respondents disagree with Petitioner's theory of repatriation and his legal analyses. Respondents contend that Petitioner's argument for repatriation is nothing more than a request for release on humanitarian grounds. Further, Respondents argue that it is immaterial whether Petitioner is able to return to the battlefield because the D.C. Circuit "has held that a court may not order the release of a detainee based on its own determination as

14

to the threat . . . the detainee . . . presents" to the United States. Opp'n at 14 (citing *Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010); *Anam v. Obama*, 696 F. Supp. 2d 1, 4 (D.D.C. 2010), *aff'd sub nom. Al-Madhwani v. Obama*, 642 F.3d 1071 (D.C. Cir. 2011)). Respondents add that Petitioner is detained in connection with a "non-international armed conflict," Opp'n at 18, which requires the Judiciary to defer to the Executive's repatriation determinations, as it defers to executive decisions on clemency and parole, *id.* at 21-22 (asserting that "the manner by which the Executive interprets its international obligations is due judicial deference").

With respect to the applicability of Army Regulation 190-8 (and, by extension, certain aspects of the Third Geneva Convention), Respondents make three arguments. First, they contend that Petitioner does not qualify as an "other detainee." Respondents argue that Petitioner's legal status was ascertained when a CSRT found him to be an "enemy combatant" in 2005. Respondents further argue that, even if Petitioner were found to be an "other detainee" under Army Regulation 190-8, he is ineligible for medical repatriation because Petitioner's refusal to accept medical treatment at Guantanamo precludes any claim that he cannot recover "in spite of treatment." *See* Army Regulation 190-8, § 3-12(*l*). Finally, Respondents contend that *Al Warafi II* is inapposite. They argue that "the holding of *Al Warafi* [*II*] . . . rests on the organic, well-defined classifications set forth in the Geneva Conventions concerning types of persons . . . rather than general considerations of medical conditions, humanitarian needs, or security/threat assessments." Opp'n at 34.

The arguments of the parties are not particularly satisfying. Contrary to Respondents' implicit characterization of the law, the Executive does not have unreviewable detention powers. While it is true that "[i]n considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be

15

accorded to the political branches," *Boumediene*, 553 U.S. at 796, detainee access to habeas review is not an empty gesture. "[F]ew exercises of judicial power are as legitimate or as necessary as the responsibility to hear challenges to the authority of the Executive to imprison a person." *Id.* at 797. Respondents exclaim that Petitioner's request for repatriation is substantively different from the ordinary habeas petition. Not so. Petitioner seeks release pursuant to domestic law (Army Regulation 190-8) and those portions of an international accord that it incorporates (the Third Geneva Convention). To be sure, the instant motion made as part of Petitioner's habeas petition is unconventional as it does not directly challenge his detention as an enemy combatant. *See Awad*, 608 F.3d at 11-12. However, the D.C. Circuit has expanded the scope of habeas, *see Aamer*, 742 F.3d 1023; *Al Warafi II*, 716 F.3d 627, and Respondents' argument that the district court is without authority to conduct a meaningful review of Petitioner's detention is contrary to the law. *See Boumediene*, 553 U.S. at 783 (explaining that for the writ of habeas corpus to "be effective[,] [t]he habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain").

Equally questionable is Respondents' contention that Petitioner's designation as an "enemy combatant" by a CSRT precludes him from being treated as an "other detainee" under Army Regulation 190-8. The Court notes that the Obama Administration apparently jettisoned the term "enemy combatant" years ago, which raises questions concerning Respondents' current reliance on it. *See* Del Quentin Wilber & Peter Finn, *U.S. Retires 'Enemy Combatant,' Keeps Broad Right to Detain*, Wash. Post, Mar. 14, 2009, at A6. Even more striking, as Petitioner argues, is *Al Warafi II*. Even though Al Warafi had been deemed an enemy combatant, Reply at 8; *see* Unclassified Am. Factual Return at 1, *In re Guantanamo Bay Detainee Litigation*, Civ.

16

No. 04-1254 (D.D.C. July 29, 2009), ECF No. 583, the D.C. Circuit nonetheless considered whether he qualified as a medic under Army Regulation 190-8, *see Al Warafi II*, 716 F.3d at 627-29. If Respondents are correct that an "enemy combatant" designation removes Guantanamo detainees from the coverage of Army Regulation 190-8, there would have been no need for the *Al Warafi II* court to conduct such an analysis. In light of these precedents, Respondents put more weight on "enemy combatant" than the term can bear.

The deficiencies in Respondents' arguments, however, do not render Petitioner a victor by default. To accept Petitioner's gauzy conception of Army Regulation 190-8 would be to elevate form over function. Petitioner makes no effort to claim prisoner of war status outright and it is doubtful that he could meet the parameters of the term. *See* Army Regulation § 1-6(e)(10); Third Geneva Convention, *supra* note 3, art. 4. Nor does he claim that there is confusion as to whether, in fact, he qualifies as a prisoner of war. *See* Army Regulation § 1-6(a)-(b), Third Geneva Convention, *supra* note 3, art. 5. Rather, Petitioner claims that he should be accorded the *privileges* that accrue to prisoners of war because CSRTs were ill-equipped to ascertain his detainee status.[8]

The parties thus present the Court with tangled arguments—a seemingly Gordian knot of regulations, detainee jurisprudence, and logic. Unraveling the knot does not require the blunt force that the parties presuppose. The solution lies where this opinion started: *Al Warafi II*. That decision provides that a Guantanamo detainee may not invoke Army Regulation 190-8, or

---

[8] *But see* Geoffrey Corn *et al.*, *Understanding the Distinct Function of the Combatant Status Review Tribunals: A Response to Blocher*, 116 Yale L.J. Pocket Part 327, 334-35 (2007), *available at* http://thepocketpart.org/images/pdfs/534.pdf (disputing view that CSRTs are inadequate under the Geneva Conventions); *see also id.* at 328-30 & n.10 (explaining that "[s]hortly after the invasion of Afghanistan, the United States determined that its conflict with al[-]Qaeda in Afghanistan was not an international armed conflict" and that Taliban fighters lacked the indicia necessary to qualify as the "armed forces" of Afghanistan).

17

the Geneva Conventions it incorporates, unless he first "explicitly establishes" his "entitlement" to repatriation under the Regulation. *Al Warafi II*, 716 F.3d at 629 ("[I]n a habeas proceeding such as this, a detainee may invoke Army Regulation 190-8 to the extent that the regulation explicitly establishes a detainee's *entitlement* to release from custody." (emphasis added)). Petitioner has not done this.

Even if the Court assumed that Section 3-12 of Army Regulation 190-8 is applicable to Petitioner,[9] he has not "explicitly established" his entitlement to repatriation under it. The record shows no attempt by Petitioner to follow the process outlined in Army Regulation 190-8. He neither has applied for repatriation, Army Regulation 190-8 § 3-12(c), nor requested an examination by a Mixed Medical Commission, *id.* § 3-12(h). It is totally speculative whether a Mixed Medical Commission would agree with Dr. Keram's diagnoses and prognoses.

---

[9] The applicability of Section 3-12 to Petitioner is distinctly unclear. Section 3-12(*l*) speaks only in terms of *eligibility* for repatriation whereas *Al Warafi II* requires an explicit showing of an *entitlement* to release. The Oxford English Dictionary, which the D.C. Circuit previously has cited for purposes of statutory interpretation, *see Sherley v. Sebelius*, 644 F.3d 388, 395 (D.C. Cir. 2011), defines an "entitlement" as "[a] legal right or just claim to do, receive, or possess something," Oxford English Dictionary Online, http://www.oed.com/view/ Entry/391624 (last visited June 24, 2014), whereas "eligibility" is defined as merely "[f]itness to be chosen or preferred," *id.*, http://www.oed.com/view/Entry/60462 (last visited June 24, 2014). Moreover, the dichotomy between *entitlement* and *eligibility* is present throughout the law, *see, e.g.*, *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 31 (1996) (holding that eligibility for a particular type of deportation waiver does not mean the Attorney General must grant such a waiver); *Cox v. U.S. Dep't of Justice*, 601 F.2d 1, 6 (D.C. Cir. 1979) (observing that "[e]ligibility [for a fees award in Freedom of Information Act, 5 U.S.C. §§ 552, *et seq.*, litigation] . . . does not mean entitlement"), *overruled on other grounds by Benavides v. Bureau of Prisons*, 993 F.2d 257 (D.C. Cir. 1993); *Amobi v. D.C. Dep't of Corr.*, 257 F.R.D. 8, 11 (D.D.C. 2009) (explaining that an attorney's failure to appear for a deposition is "the sort of conduct that is eligible for sanction" under the Federal Rules of Civil Procedure, but declining to impose a sanction), and it is woven into the Circuit's most recent expansion of habeas jurisdiction, *see Aamer* 742 F.3d at 1036 (finding for the first time that detainees may use the Writ to challenge conditions of confinement, in part, because analogous habeas decisions in this jurisdiction stood for the "straightforward" proposition that "in either a conditions of confinement or place of confinement case," the writ of habeas corpus is available to a petitioner who "contends that some aspect of his confinement has deprived him of a right to which he is *entitled* while in custody." (emphasis added)).

Petitioner essentially asks this Court to substitute its judgment for that of a Mixed Medical Commission. *Al Warafi II* provides no legal basis to accede to his request, and his request, at best, is premature given that he has made no move to follow the regulatory process. The only question here is whether Petitioner has "explicitly establishe[d]" his "*entitlement* to release from custody" under Army Regulation 190-8. *Al Warafi II*, 716 F.3d at 629 (emphasis added). Section 3-12 of the Regulation conditions medical repatriation on the determinations of a Mixed Medical Commission. Because Petitioner has not been examined by such a Commission, he necessarily has not established his explicit entitlement to release under the Regulation.

## IV. CONCLUSION

Petitioner seeks repatriation to the United Kingdom due to his alleged mental illness. However, Petitioner has not established an explicit entitlement to repatriation under Army Regulation 190-8. Accordingly, the Court will deny Petitioner's Motion, Dkt. 255. A memorializing Order accompanies this Opinion.

/s/<br>
ROSEMARY M. COLLYER<br>
United States District Judge

Date: June 24, 2014